**CASINO VENTURES, Plaintiff–Appellee,**

v.

**Robert M. STEWART, in his official capacity as Chief of the State Law Enforcement Division; Charles M. Condon, Attorney General, Defendants–Appellants.**

No. 98–2653.

United States Court of Appeals,
Fourth Circuit.

Argued: May 7, 1999.

Decided: July 6, 1999.

**ARGUED:** Nathan Kaminski, Jr., Senior Assistant Attorney General, Columbia, South Carolina, for Appellants. Edward A. Frazier, Edward A. Frazier, P.A., Columbia, South Carolina, for Appellee. **ON BRIEF:** Charles M. Condon, South Carolina Attorney General, Robert D. Cook, Assistant Deputy Attorney General, Christie Newman Barrett, Assistant Attorney General, Columbia, South Carolina, for Appellants.

Before WILKINSON, Chief Judge, NIEMEYER, Circuit Judge, and MOON, United States District Judge for the Western District of Virginia, sitting by designation.

Reversed by published opinion. Chief Judge WILKINSON wrote the opinion, in which Judge NIEMEYER and Judge MOON joined.

## OPINION

WILKINSON, Chief Judge:

Casino Ventures plans to offer gambling cruises from a port in South Carolina. Fearing prosecution, it brought suit seeking a declaration that state gambling laws prohibiting such cruises had been preempted by the Johnson Act, 15 U.S.C. § 1175. The district court found the state laws were preempted. *Casino Ventures v. Stewart*, 23 F.Supp.2d 647, 649 (D.S.C. 1998). We reverse, holding that the Act does not preempt state regulatory authority over gambling. Thus South Carolina authorities remain free to enforce state criminal prohibitions against illicit gambling cruise activity.

### I.

Casino Ventures seeks to operate a "day cruise" or "cruise to nowhere" business from a dock in South Carolina. The business would entail short cruises on ships that depart from and return to the same port in South Carolina without making any intervening stops. Once the ship is outside of the state's territorial waters, Casino Ventures would offer gambling to its passengers.

Casino Ventures fears that its cruise business will violate South Carolina criminal laws restricting gambling. State statutes have long prohibited the possession and use of certain gambling devices within South Carolina territory. In particular, Casino Ventures alleges that its business operations may violate South Carolina's ban on lotteries, S.C. Code Ann. §§ 16–19–10 to –30, its ban on unlawful games and betting, *id.* §§ 16–19–40, 16–19–130, and its ban on the possession and use of gaming tables and machines, *id.* §§ 12–21–2710, 12–21–2712, 16–19–50, 16–19–120.

To allay this fear of criminal prosecution, Casino Ventures brought suit against Robert M. Stewart, Chief of the State Law Enforcement Division, and Charles M. Condon, Attorney General of South Carolina. Casino Ventures sought a declaration that South Carolina's gambling laws are preempted by federal law and an order enjoining the enforcement of those state laws. Specifically, it asserted that the 1992 amendments to the Johnson Act created a federal right to operate a gambling cruise to nowhere. Pub. L. 102–251, § 202, 106 Stat. 60, 61–62 (1992).

The 1992 amendments altered the Johnson Act's general ban on maritime gambling. Prior to the amendments, it was "unlawful to manufacture, recondition, repair, sell, transport, possess, or use any gambling device ... within the special maritime" jurisdiction of the United States. 15 U.S.C.A. § 1175 (1990). The Justice Department, however, interpreted this prohibition not "to apply to foreign-flag vessels entering the United States." H.R. Rep. No. 102–357 (1991). The effect was that American flag vessels were restricted from offering gambling to their passengers while foreign flag vessels were free to do so. This put American flag vessels at a competitive disadvantage in the lucrative leisure cruise industry. *See id.*

Congress reacted to the disparity by amending the Johnson Act to make clear that it applied to vessels "documented under the laws of a foreign country." 15 U.S.C. § 1175(a). Additionally, Congress crafted exceptions to the Johnson Act's blanket restrictions related to gambling devices. First, section 1175 no longer restricts the transport and possession of gambling devices on vessels, provided that those devices are not used while the vessel is within the boundaries of a state or possession of the United States. *Id.* § 1175(b)(1)(A)-(B). Second, section 1175 no longer prohibits the repair and use of gambling devices outside of those boundaries, unless the ship is on a cruise to nowhere and the state in which that cruise "begins and ends has enacted a statute the terms of which prohibit that repair or use on that voyage." *Id.* § 1175(b)(1)(A), (b)(2).

After examining these amendments, the district court granted Casino Ventures' request for a declaratory judgment. First, the court held that the 1992 amendments created a federal right to operate day cruises, thereby preempting conflicting state laws. *Casino Ventures,* 23 F.Supp.2d at 649. Second, the court noted that under section 1175a state could defeat preemption if it "has enacted a statute the terms of which prohibit that repair or use" on cruises to nowhere. 15 U.S.C. § 1175(b)(2)(A). But it found that South Carolina's existing laws restricting gambling did not meet this statutory requirement because they were not passed after the 1992 amendments took effect. *Casino Ventures,* 23 F.Supp.2d at 649–50. Thus, the district court declared that Casino Ventures could lawfully operate a cruise to nowhere business in South Carolina. *Id.* at 652. Stewart and Condon appeal. Because we hold that the district court's initial finding of federal preemption was erroneous, we reverse.[1]

---

1. By reversing on preemption grounds, we need not reach the district court's ruling that a state must reenact its laws against gambling in order to make it a federal crime to operate a gambling cruise to nowhere. *See* 15 U.S.C. § 1175(b)(2)(A).

## II.

■ Although the Constitution plainly permits federal law to supplant state authority, "[c]onsideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981); *see also Worm v. American Cyanamid Co.*, 970 F.2d 1301, 1305 (4th Cir.1992). This presumption is at its zenith when federal law impinges upon core state police powers. States have long possessed primary responsibility in our federal system to protect the health, welfare, safety, and morals of their citizens. The Supreme Court has indicated "that when a State's exercise of its police power is challenged under the Supremacy Clause, 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 157, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978) (*quoting Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)); *see also Reid v. Colorado*, 187 U.S. 137, 148, 23 S.Ct. 92, 47 L.Ed. 108 (1902). This "approach is consistent with both federalism concerns and the historic primacy of state regulation of matters of health and safety." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996).

■ The state laws at issue in this case restrict gambling within South Carolina. Because such restrictions are aimed at promoting the welfare, safety, and morals of South Carolinians, they represent a well-recognized exercise of state police power. *Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 341, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986). For this reason, respect for state prerogatives dictates a cautious preemption analysis—one which is reluctant to imply a broad ouster of state authority.

## III.

Neither party contends that Congress has expressly preempted the state laws at issue here. Instead, Casino Ventures argues that state laws banning the use and possession of gambling devices on vessels have been impliedly preempted by federal law. Casino Ventures asserts that the 1992 amendments to the Johnson Act worked an implicit preemption of state laws, such as South Carolina's, that prohibit gambling voyages to nowhere.

■ We disagree. "The purpose of Congress is the ultimate touch stone" in a preemption case. *Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963). That being so, state law is preempted "if federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (internal quotation marks omitted). Additionally, courts imply preemption if state law "actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984) (citation omitted); *see also Worm*, 970 F.2d at 1304.

### A.

■ There is no basis for finding federal field preemption of South Carolina's restrictions on gambling. Maritime matters and gambling are not fields subject to exclusive federal control. To the contrary, federal law in these fields respects both our system of dual sovereignty and the important regulatory interests of the states.

As a general matter, "Maritime law is not a monistic system. The State and

Federal Governments jointly exert regulatory powers today as they have played joint roles in the development of maritime law throughout our history." *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 374, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959).

This is also true of the regulation of gambling. Indeed, Congress has explicitly recognized the preeminent state interests in controlling gambling and has sought to extend, not curb, state police power in this field. Congress has done so by delegating to the states significant authority to shape applicable federal law. For example, it is a federal crime "to transport any gambling device to any place in a State." 15 U.S.C. § 1172(a). But such activity is not a federal crime if a state so chooses: each state may change the content of this federal law simply by "enact[ing] a law providing for the exemption of such State from the provisions of this section." *Id.* Similarly, it is a federal crime for a person engaged in the business of betting to knowingly use wire communications to transmit bets interstate. 18 U.S.C. § 1084(a). But Congress has decided not to make that conduct illegal if both the transmitter and receiver of such information are located in states that have legalized such betting. *Id.* § 1084(b). In each case, Congress has acted in aid, not in derogation, of state regulatory authority.

Likewise, the combined field of maritime gambling leaves room for state regulation. In fact, Congress initially enacted the Johnson Act "to support the policy of those States which outlaw slot machines and similar gambling devices, by prohibiting use of the channels of interstate or foreign commerce for the shipment of such machines or devices into such States." H.R. Rep. No. 81–2769 (1950). In that supporting role, Congress expressly did not apply 15 U.S.C. § 1175 to state territorial wa-

ters. By its terms, section 1175 applies only to vessels "within the special maritime and territorial jurisdiction of the United States as defined in section 7 of Title 18." 15 U.S.C. § 1175(a). The special maritime jurisdiction of the United States specifically excludes waters subject to the control of state authorities. 18 U.S.C. § 7(1) (special maritime jurisdiction includes the high seas and "any other waters within the admiralty and maritime jurisdiction of the United States and *out of the jurisdiction of any particular State*"(emphasis added)); *see also United States v. Tanner,* 471 F.2d 128, 141 (7th Cir.1972) (noting that under 18 U.S.C. § 7(1) "there can be no concurrent federal and state jurisdiction"); 2 Benedict on Admiralty § 112(a)[1] (7th rev. ed.1998).[2]

Additionally, by enacting section 1175 Congress extended the reach of state police power beyond state territorial waters: that provision permits states to change the content of federal law with respect to cruises to nowhere. Although the 1992 amendments to the Johnson Act generally permit the use of gambling devices on the high seas, they permit states to reverse course and opt to have cruising to nowhere remain a federal crime. 15 U.S.C. § 1175(a)-(b). Cruises to nowhere remain a federal crime if a state "has enacted a statute the terms of which prohibit" the use of gambling devices on such cruises. *Id.* § 1175(b)(2)(A).

Section 1175—which expressly withdraws federal regulation from state territorial waters and permits states to determine the content of federal law outside of those waters—recognizes the vital state regulatory interests in gambling controls. From this we cannot conclude that maritime gambling is a field "in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same

---

**2.** The special maritime jurisdiction of the United States does include some state territorial waters. *See* 18 U.S.C. § 7(2) (including United States flag vessels on the St. Lawrence River, the Great Lakes, and on any waters connecting the Great Lakes). Those waters, however, are not at issue in this case.

subject." *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985) (internal quotation marks omitted). The criminal regulation of gambling, even gambling taking place within the admiralty and maritime jurisdiction of the United States, is simply not a field over which Congress has sought exclusive regulatory authority and the displacement of state law.

### B.

■ Nor do we find that South Carolina's laws conflict with the federal statute at issue here. As noted, the plain language, structure, and purpose of section 1175 is completely at odds with preemption. That federal enactment does not even apply to South Carolina's territorial waters—it leaves regulation of those waters to the state. 15 U.S.C. § 1175(a); 18 U.S.C. § 7(1). This alone leads to the conclusion that state and federal laws are not in conflict. But the statute goes even further. It criminalizes gambling cruises to nowhere outside of a state's territorial waters if a state enacts a law banning them. 15 U.S.C. § 1175(b)(2). By permitting states to adjust the contours of federal law, section 1175 augments state authority. In fact, the entire theme of this statute is one of cooperative federalism and respect for dominant state interests. Nothing leads to the conclusion that federal law has supplanted South Carolina's regulatory authority over gambling.

Further, preemption was not an issue that Congress overlooked. The very statute at issue in this case contains an express provision preempting the gambling laws of Alaska on certain voyages. It states that

> With respect to a vessel operating in Alaska, this section does not prohibit, nor may the State of Alaska make it a violation of law for there to occur, the repair, transport, possession, or use of any gambling device on board a vessel which provides sleeping accommodations for all of its passengers....

15 U.S.C. § 1175(c)(1). This is strong evidence that Congress did not wish to extend preemption any further: "When Congress has considered the issue of preemption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a reliable indicium of congressional intent with respect to state authority, there is no need to infer congressional intent to preempt state laws from the substantive provisions of the legislation." *Cipollone*, 505 U.S. at 517, 112 S.Ct. 2608 (citation and internal quotation marks omitted); *see also Freightliner Corp. v. Myrick*, 514 U.S. 280, 287–89, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995).

Moreover, this express exception would be unnecessary if Casino Ventures' reading of the statute were correct. Casino Ventures asserts that the statute not only legalizes as a matter of federal law, but also preempts states from criminalizing, the transport and possession of gambling devices on all vessels. But if this were so, there would be no need to add an exception explicitly forbidding Alaska from banning transport and possession. If Casino Ventures' reading were correct, states were already preempted from interfering with those activities. The Alaska exception only makes sense if states are not generally preempted from barring the possession and transportation of gambling devices within their territorial waters.

Finally, allowing states to make their own regulatory choices about gambling does not interfere with the purpose of the 1992 amendments. Before the amendments, foreign flag ships were permitted to offer gambling on the high seas while American vessels were forbidden from doing so. By amending the Johnson Act, Congress sought to place all vessels on equal footing. Congress never suggested that it was legislating to remedy an inefficient patchwork of varied state laws. *See* 1 Thomas J. Schoenbaum, Admiralty and Maritime Law § 4–5 (2d ed.1994); *see also Pacific Merchant Shipping Ass'n v. Au-*

*bry,* 918 F.2d 1409, 1422 (9th Cir.1990). Instead, the amendments sought only to put an end to the discriminatory treatment of United States flag vessels under federal law.

The committee reports and floor statements speak only to this purpose. H.R. Rep. No. 102–357 (1991) ("The clear intent and purpose of this amendment to the Johnson Act is to allow those activities on U.S.–flag vessels to the same extent that they are currently allowed on foreign-flag vessels."); 138 Cong. Rec. H71 (daily ed. Jan. 28, 1992)(statement of Rep. Davis) (same); *id.* at H70 (statement of Rep. Jones) (The law "will enable our U.S. vessels to operate on a level playing field with foreign flag cruise ships with respect to gambling."). And Congress explicitly recognized that state laws regulating gambling would continue to operate. 138 Cong. Rec. H72 (daily ed. Jan. 28, 1992) (statement of Rep. Lent) ("This bill preserves the right of a coastal State to enact legislation that prohibits gambling on a vessel that operates from a port of that State even if the vessel sails from that port out into international waters and then returns to the same port."). Representative Lent made it clear that federal law was not ousting the authority of states to prohibit and regulate gambling. He noted that "The committee was aware that a number of coastal States do not want gambling on vessels in their waters and this legislation retains the right of States to continue to prohibit gambling." *Id.*

For all of these reasons, we join those courts that have rejected the argument that 15 U.S.C. § 1175 preempts state laws prohibiting gambling and gambling devices. *Padavan v. City of New York,* 685 N.Y.S.2d 35, 35–36 (N.Y.App.Div.1999) (rejecting the assertion that the 1992 amendments preempt local regulation); *Butterworth v. Chances Casino Cruises, Inc.,* 1997 WL 1068628, at *4 (M.D.Fla.) (holding that section 1175 does not completely preempt state gambling device laws). The lifting of federal restrictions on gambling outside state territorial waters does not preempt state gambling prohibitions within those waters. States remain free to regulate gambling within their territorial waters.

### IV.

Casino Ventures suggests that in amending the Johnson Act, Congress prohibited states from exercising their core police powers to ban gambling and gaming devices. We do not agree. States have long regulated in this area. And state primacy here has only been reinforced by congressional enactments, including the one before us, which grant states significant control over the substance of federal criminal laws dealing with gambling. Far from expressing the required "clear and manifest" purpose to displace state authority, Congress has voiced a desire to retain and defer to state choices in this area. Implying preemption here would defeat, not advance, these federal objectives. For this reason, the judgment of the district court is hereby

*REVERSED.*