**LEISURE TIME CRUISE CORPORATION,**
Plaintiff,

v.

**TOWN OF BARNSTABLE; Cape Cod Commission; and Town of Barnstable Conservation Commission by and through its members Albert O. Barbour, Elisabeth E. Clark, Deborah J. Shiflett–Fitton, Edward O. Handy, Virginia D. Keil, Robert A. Lancaster, and Judith A. Heller, Defendants.**

No. Civ.A. 99–11271–MLW.

United States District Court,
D. Massachusetts.

July 29, 1999.

Michael J. Princi, Wynn & Wynn, P.C., Hyannis, MA, for plaintiff.

Robert D. Smith, Ruth J. Weil, Hyannis, MA, Eric W. Wodlinger, Choate, Hall & Stewart, Boston, MA, Jocelyn M. Sedney, Leonard H. Kesten, Brody, Hardoon, Perkins & Kesten, Boston, MA, for Defendants.

## ORDER

SARIS, District Judge.

This case involves a high-stakes struggle over gambling off the coast of Cape Cod in the waters of Nantucket Sound. Plaintiff Leisure Time Cruise Corporation ("Leisure Time") has moved for a preliminary injunction enjoining the defendants from interfering with its operation of a gambling boat, a so-called "cruise to nowhere," out of Hyannis Harbor. Because state regulation of gambling is not federally preempted and no due process rights have been violated, gambling is not in the cards this summer for Cape Cod. After hearing, the motion for preliminary relief is *DENIED.*

## BACKGROUND

The record contains evidence of the following facts:

### Site Plan Approval

In April 1999, Leisure Time obtained a lease for a parcel of property in Hyannis, Massachusetts, containing a restaurant, docking, and parking facilities. As it was required to do by local law, on May 11, 1999, Leisure Time made Site Plan Application to the Town of Barnstable and provided specific information to the Town's building commissioner regarding its intention to operate a twice-daily gambling cruise out of the harbor on the MV Leisure Lady, a United States flag vessel. Known as a "cruise to nowhere," the trip would entail carrying 500 passengers daily into international waters in Nantucket Sound for several hours of gambling, dining, drinking, and entertainment. The ship would then return to the dock without making any intervening stops. After a lengthy public hearing on May 18, 1999, at which several Town Councilors objected to the proposed gaming activities, the building commissioner requested and received supplemental information from Leisure Time concerning these activities. The Site Plan Review hearing concluded on June 1, 1999.

Despite the opposition to the project, the building commissioner issued a Site Plan approval, which Leisure Time agreed to and signed in draft form on June 8, 1999, and in final form on June 10, 1999. Successful completion of a Site Plan Review does not allow the applicant to bypass local or regional requirements. Therefore, the approval (and hence operation of the gambling boat) was explicitly conditioned on Leisure Time's procurement of a number of local permits and on the performance of a long list of improvements to the waterfront and parking areas. To date, plaintiff has not fulfilled many of these conditions.

### The Conservation Commission

On June 9, 1999, the Town of Barnstable Conservation Commission (the "Conservation Commission") issued a cease and desist order requiring Leisure Time to remove permanently the gambling boat from its berth, in part on the ground that the pilings did not comply with the conditions to Site Plan approval. After a hearing on June 15, 1999, a second cease and desist order issued. The Conservation Commission has the authority to regulate public trust rights, recreation, and navigation under the Wetlands Protection Ordinance, Chapter III, Article 27. *See Fafard v. Strauss*, No. 97–771 (Barnstable Sup.Ct. Apr. 22, 1999).

### The Cape Cod Commission

In the meantime, on May 27, 1999, the Conservation Commission referred the project to the Cape Cod Commission, a regional planning and land use commission created by an Act of the Massachusetts General Court and possessing broad authority to regulate developments of regional impact ("DRI"s), *see* 1990 Mass. Acts ch. 716, § 1(b).[1] A DRI is generally defined as "a development which, because of its magnitude or the magnitude of its impact on the natural or built environment, is likely to present development issues significant to or affecting more than one municipality." *Id.* § 2(h). The Barnstable County Assembly of Delegates has the authority to adopt "standards and criteria" for determining what constitutes a DRI. *Id.* at § 12(a); *see also Flynn v. Burman*, 30 F.Supp.2d 68, 71 (D.Mass. 1998) (discussing the Cape Cod Commission's jurisdiction). Municipal agencies must refer any proposed development that meets the pertinent criteria to the Cape Cod Commission for review as a DRI before they can take any action to grant approval for the project. *See* 1990 Mass. Acts ch. 716, § 12(h); *Flynn*, 30 F.Supp.2d at 71. While the Cape Cod Commission is considering the mandatory

---

1. The Act Establishing the Cape Cod Commission, 1990 Mass.Acts ch. 716, was passed by the General Court of Massachusetts in 1989 and approved in 1990.

referral, the local authorities' review of the matter is suspended, as are the statutory time periods governing such review. *See* 1990 Mass.Acts ch. 716, § 12(h); *Flynn,* 30 F.Supp.2d at 71.

In addition, the Cape Cod Commission has the discretion to consider proposed developments that do not fall within the criteria warranting mandatory referral. *See* 1990 Mass.Acts ch. 716, § 12(e); *Flynn,* 30 F.Supp.2d at 71. The standards and criteria to be used in determining whether a project should be reviewed include, among other things, the impact on environmental and natural resources, the impact on existing capital facilities, the physical size of the development, the amount of pedestrian and vehicular traffic the development would produce, the location of the development near a waterway, and the importance of the development to economic development in the region. *See* 1990 Mass.Acts ch. 716, § 12(b).

If the Cape Cod Commission ultimately approves the proposed DRI, the municipality may issue the appropriate permits. *See id.* § 13(d), (e); *Flynn,* 30 F.Supp.2d at 71. If the Cape Cod Commission disapproves the DRI, "no further work may be done on the development." 1990 Mass. Acts ch. 716, § 13(e).

The Cape Cod Commission accepted the Conservation Commission's referral under its discretionary referral power at a hearing on June 17, 1999. Prior to the hearing, plaintiff had the opportunity to respond in writing to the Cape Cod Commission's staff report discussing the potential impact on Cape Cod resources. The Cape Cod Commission also voted to take jurisdiction of the proposed project as a mandatory referral on the ground that the project constituted a DRI. It has not yet received a DRI application from Leisure Time or taken any further steps in its review process. In accordance with regulations, all review by municipal agencies of local permit applications has been suspended pending the outcome of the Cape Cod Commission's review.

*The Lawsuit*

Plaintiff filed this lawsuit on June 11, 1999, seeking a declaratory judgment that federal law prevents defendants from asserting jurisdiction over, regulating, or taking any action that has the effect of regulating the operation of its gambling cruise. Plaintiff also seeks damages pursuant to 42 U.S.C. § 1983 for alleged violations of its due process and equal protection rights.

While still at its berth, the Leisure Lady vows to fight state regulation "to the death."

## DISCUSSION

In determining whether a preliminary injunction is warranted, this Court must consider "(1) the likelihood of success on the merits, (2) the potential for irreparable harm to the movant, (3) the balance of the movant's hardship if relief is denied versus the nonmovant's hardship if relief is granted, and (4) the effect of the decision on the public interest." *Philip Morris, Inc. v. Harshbarger,* 159 F.3d 670, 673 (1st Cir.1998). "Likelihood of success is the touchstone of the preliminary injunction inquiry." *Id.* at 674.

### I. *Likelihood of Success*

#### A. *Johnson Act Preemption*

Plaintiff's primary claim is that the Johnson Act, 15 U.S.C. §§ 1171–1178, which governs the transportation, possession, and use of gambling devices, preempts any effort by the state of Massachusetts, the Cape Cod Commission, or the Town of Barnstable to regulate, directly or indirectly, Leisure Time's gambling boat operation.

Section 1175 of the Act generally prohibits the "manufacture, recondition[ing], repair, s[ale], transport, possess[ion], or use [of] any gambling device" within the special maritime jurisdiction of the United States. 15 U.S.C. § 1175(a). However, the statute creates the following exception:

(b) Exception

(1) In general

Except as provided in paragraph (2), this section does not prohibit—

(A) the repair, transport, possession, or use of a gambling device on a vessel that is not within the boundaries of any State or possession of the United States;

(B) the transport or possession, on a voyage, of a gambling device on a vessel that is within the boundaries of any State or possession of the United States, if—

. . . .

(ii) the gambling device remains on board that vessel while the vessel is within the boundaries of that State or possession; . . .

. . . .

(2) Application to certain voyages

(A) General rule

Paragraph (1)(A) does not apply to the repair or use of a gambling device on a vessel that is on a voyage or segment of a voyage described in subparagraph (B) of this paragraph if the State or possession of the United States in which the voyage or segment begins and ends has enacted a statute the terms of which prohibit that repair or use on that voyage or segment.

(B) Voyage and segment described

A voyage or segment of a voyage referred to in subparagraph (A) is a voyage or segment, respectively—

(i) that begins and ends in the same State or possession of the United States, and

(ii) during which the vessel does not make an intervening stop within the boundaries of another State or posses-

sion of the United States or a foreign country.

*Id.* § 1175(b).

The Town of Barnstable argues that, under a two-hundred-year-old Massachusetts statute outlawing gaming houses, gambling "cruises to nowhere" are illegal in the state. *See* Mass.Gen.L. ch. 271, § 5 ("Whoever keeps or assists in keeping a common gaming house, or building or place occupied, used or kept for [gaming purposes], . . . shall be punished by a fine of not more than fifty dollars or by imprisonment for not more than three months."); *id.* § 1A (specifying that "[t]he words 'house', 'building' and 'place' used severally or together in this chapter shall mean and include a ship or vessel when it is within the territorial limits of the commonwealth"); *see also, e.g., id.* § 5A (prohibiting, *inter alia,* the "manufacture[ ], transport[ ], s[ale], . . . stor[age], display[ ], repair[ ], . . . possess[ion] or use[ ][of] any gambling device or parts for use therein"). According to the Town, § 1175(b)(2)(A) applies, and any state regulation is lawful.

Leisure Cruise responds that § 1175(b)(2)(A) does not authorize state regulation because Massachusetts has not specifically prohibited "cruises to nowhere" as described in § 1175(b)(2)(B). In a well-reasoned opinion, the Fourth Circuit has held that the Johnson Act does not preempt existing pre-Act state criminal prohibitions against gambling and gambling devices and that states "remain free to regulate gambling within their territorial waters." *Casino Ventures v. Stewart,* No. 98–2653, 1999 WL 455357, at *1, *6 (4th Cir. July 6, 1999) (concluding that state authorities are "free to enforce state criminal prohibitions against illicit gambling cruise activity"); *see also Butterworth v. Chances Casino Cruises, Inc.,* No. 97–846–CIV–J–20, 1997 WL 1068628, at *4 (M.D.Fla. July 14, 1997) (rejecting the contention that the Johnson Act completely preempts pre-Act state laws regulating the possession and use of gambling devices). Because it was ruling on preemption

grounds, the court did not reach the question of whether a state must reenact its laws against gambling in order to make it a *federal* crime to operate a gambling cruise to nowhere under § 1175(b)(2)(A). *See Casino Ventures,* 1999 WL 455357, at *6 n. 1.

■ This Court need not reach the issue of whether the cruise to nowhere is illegal under state and/or federal law, because all that is contemplated here is regulation by local and regional authorities of the land, wetland, and pier uses ancillary to Leisure Time's operation of its gambling cruise. The Johnson Act does not explicitly preempt such regulation. Courts imply preemption if the law in question " 'actually conflicts' with federal law," *Philip Morris, Inc. v. Harshbarger,* 122 F.3d 58, 68 (1st Cir.1997) (quoting *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992)), such that "compliance with both [local] and federal law is a 'physical impossibility,' " *id.* (quoting *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 143, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963)), or the "[local] law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' " *id.* (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)). In addition, "the pervasiveness of a federal scheme, the dominance of the federal interest, or the federal goals and obligations" may indicate that Congress intended the federal law to occupy the field and preclude state and local supplementation. *Id.*

Compliance with both the Johnson Act and local and regional regulation would by no means be impossible in this case. As Leisure Cruise agrees, the Town of Barnstable's permitting laws and Site Plan approval process do not cut off plaintiff's ability to run its business, but only impose certain prerequisites to its operation. Nothing in the present record suggests that undergoing regulation by the Conservation Commission or the Cape Cod Commission would impede Leisure Time's ability to comply with any federal statutory requirements.

■ Additionally, defendants' regulation of the project presents no obstacle to achieving Congress's purposes in the Johnson Act—to ensure that United States flag vessels are not at a competitive disadvantage with foreign flag vessels, *see Casino Ventures,* 1999 WL 455357, at *1 (discussing legislative history). The 1992 amendments to the Johnson Act altered the Act's general ban on maritime gambling, which had prevented American flag vessels, but not foreign flag vessels, from offering gambling to their passengers. *See id.* To remedy this competitive disadvantage, the amendments to the Johnson Act make the Act applicable to both foreign and American vessels and forge exceptions to the categorical ban on gambling within the maritime jurisdiction of the United States. *See id.*

There is also no indication that Congress intended the Act to occupy the gaming field. In fact, the statute was designed to extend states' police power to control gambling. *See id.* at *3–*4 (noting that § 1175 "does not even apply" to states' territorial waters and that it "permits states to change the content of federal law" with respect to gambling on the high seas); *see also id.* at *4 (finding "the plain language, structure, and purpose of section 1175" of the Act to be "completely at odds with preemption"). The statute's effect on local regulation of gambling is no different. *See Padavan v. City of New York,* 685 N.Y.S.2d 35, 35–36 (N.Y.App.Div.1999) (holding that § 1175 "cannot be understood to deprive ... municipalities of the prerogative, in the exercise of their police powers, to reasonably regulate the conduct of shipboard gambling businesses operating from within their jurisdictional bounds").

If § 1175 permits state and municipal efforts to regulate gambling directly, then it cannot be interpreted to preempt local

zoning or other laws regulating Leisure Time's restaurant, parking, or docking facilities—laws at the very heart of local governance—even if they indirectly impact the operation of plaintiff's gambling cruise. *Cf. Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 390, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (cautioning that, even in the context of an expressly preemptive federal statute, " '[s]ome state actions may affect [the subject of the federal regulation] in too tenuous, remote, or peripheral a manner' " to be preempted (first alteration in original) (quoting *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 100 n. 21, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983))).

This Court concludes that Leisure Time has failed to demonstrate a likelihood of success on its federal preemption claim.

### B. *Substantive Due Process*

■ Plaintiff also claims that defendants have deprived it of property without due process of law by manipulating their own regulatory and jurisdictional schemes in order to control its gambling activities. According to Leisure Time, defendants' efforts to enforce local zoning and other laws and to subject plaintiff's project to the Conservation Commission and Cape Cod Commission review are a "regulatory piling on" or a "smokescreen" set up for the purpose of regulating gambling through the backdoor. As part of its evidence, plaintiff points to a recent article in *The Boston Globe* in which Robert Gatewood, an official with the Conservation Commission, indicated that the gambling issue was the Conservation Commission's primary concern in reviewing the project.

■ Leisure Time's allegations do not rise to the level of a substantive due process violation. The First Circuit has adopted an extremely high threshold for such claims, especially in the permitting context. *See, e.g., Nestor Colon Medina & Sucesores, Inc. v. Custodio,* 964 F.2d 32, 45 (1st Cir.1992) ("[W]e have consistently held that the due process clause may not ordinarily be used to involve federal courts

in the rights and wrongs of local planning disputes."); *PFZ Properties, Inc. v. Rodriguez,* 928 F.2d 28, 31 (1st Cir.1991) (same). In order to show a violation, the plaintiff must set forth an " 'abuse of government power that shocks the conscience,' or 'action that is legally irrational in that it is not sufficiently keyed to any legitimate state interests.' " *Id.* at 31–32 (quoting *Committee of U.S. Citizens Living in Nicaragua v. Reagan,* 859 F.2d 929, 943 (D.C.Cir.1988)).

Plaintiff's allegations do not meet this standard. The Cape Cod Commission in particular has extremely broad authority to further environmental protection and conservation and the "preservation of historical, cultural, ... and recreational values." 1990 Mass.Acts ch. 716, § 1(c). Concerns such as zoning compliance and increased traffic congestion on Cape Cod are matters well within the jurisdiction of the Cape Cod Commission to address. This sweeping authority embraces an evaluation of the impact of gambling on Cape Cod's tourist industry and the economy of the region. However, even if defendants' regulatory enforcement actions are an illegitimate smokescreen or "outside of the normal channels," plaintiff has not demonstrated a likelihood of success on its due process claim. It would be difficult to do so, because the Cape Cod Commission proceedings have not even commenced. Generally, in the absence of matters that implicate the Constitution, such as racial animus, violations of state law or administrative procedures have not been held to constitute a substantive due process deprivation. *See, e.g., Custodio,* 964 F.2d at 45 (citing cases); *PFZ Properties,* 928 F.2d at 31 (same). Although plaintiff claims that some officials are motivated by an anti-gambling animus, plaintiff has presented no evidence of a First Amendment retaliation claim.

### C. *Procedural Due Process*

■ Plaintiff also asserts a procedural due process claim. Though not particular-

ly well-articulated, the thrust of this complaint appears to be Leisure Time's allegation that it never received notice of or an opportunity to be heard in connection with the Conservation Commission's vote to refer the project to the Cape Cod Commission. Although the Cape Cod Commission's regulations entitle affected parties to notice and a hearing once its review process is underway, *see, e.g.,* 1990 Mass.Acts ch. 716, § 5(h), plaintiff has pointed to no such regulatory requirement concerning initial decisions by municipal agencies to refer projects to the Cape Cod Commission. In any event, plaintiff was given an opportunity to be heard at the Cape Cod Commission prior to its decision to accept the referral.

■ On a more troubling note, plaintiff complains of the enforcement order under the Massachusetts Wetlands Protection Act, Mass.Gen.L. ch. 131, § 40, issued by the Conservation Commission without advance notice on June 9, 1999. This ordered, among other things, that the "MV Leisure Lady ... be permanently removed from the slip it occupies by June 16, 1999 at noon" and that "[c]luster piling" be removed by the same deadline. This dispute apparently arises from a disagreement over the configuration of the pilings and the allegation of improper dredging. The order noted that any appeal had to be directed to the Superior Court and that the enforcement would be discussed at a hearing on June 15. Plaintiff contends that the Conservation Commission's abrupt ex post facto action ordering the boat to leave the pier and alleged sudden about-face on the permissibility of the plaintiff's pilings and pier raise procedural due process concerns. Gatewood retorts that he informed plaintiff at the May 20, 1999, Site Plan Review hearing of his concern that it needed to get authority to convert a recreational slip to a commercial one. Although the actions of the Conservation Commission are hotly disputed, a hearing was held and the state provides an adequate review process. *Cf. PFZ Properties,* 928 F.2d at 31 (finding adequate process where the developer, through a "combination of administrative and judicial remedies," had the right to petition the state agency for reconsideration of its adverse decision and to petition the Superior Court for review). In any event, any procedural irregularities in the issuance of the enforcement order are without consequence here, because once the Cape Cod Commission accepted the referral, all permitting had to stop.

### D. *Equal Protection*

■ Finally, Leisure Time has not demonstrated a likelihood of success on its discrimination claim. In order to make out an equal protection claim outside the context of invidious classifications like race and sex, a plaintiff must show "egregious procedural irregularities or abuse of power." *Id.* at 32; *see also Custodio,* 964 F.2d at 44–45 (expressing reluctance to "open[ ] up local permitting decisions to detailed federal judicial scrutiny under equal protection rubric" for fear of creating a flood of litigation).

Leisure Time has not met this difficult standard. It has presented no evidence of differential treatment of similar projects by the defendants, as required to substantiate an equal protection violation. *See, e.g., id.* at 43 (rejecting an equal protection claim because the plaintiff had "point[ed] to no allegations of fact in the complaint, nor to anything in the record, bearing out the conclusory assertion that others similarly situated were treated differently from himself").

### II. *Irreparable Harm*

■ In any event, the Court further finds that Leisure Time has not shown that it will suffer irreparable harm if it is prevented from running its cruise while its claims are being litigated. To demonstrate a risk of irreparable harm, a plaintiff must show that it has experienced "a substantial injury that is not accurately measurable or adequately compensable by money damages." *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12, 19 (1st Cir.1996).

Leisure Time has not lost the sort of "unique or fleeting business·opportunity" that the First Circuit has held may be sufficiently immeasurable to constitute irreparable harm. *See Starlight Sugar, Inc. v. Soto,* 114 F.3d 330, 332 (1st Cir.1997). Leisure Time runs a similar gambling boat out of Gloucester, Massachusetts, and thus has a solid basis for calculating its lost profits on the Hyannis cruise. In addition, as a new business, plaintiff has not yet established goodwill or a customer base in the area and is not likely to be affected by any "restricted access" to its property or by "less commodious parking." *K–Mart Corp. v. Oriental Plaza, Inc.,* 875 F.2d 907, 915 (1st Cir.1989) (identifying loss of goodwill, "diminished visibility," and restricted access and parking as injuries that may "defy precise dollar quantification").[2]

III. *Balance of Hardships and Public Interest*

"[A] trial court need not make findings concerning the third and fourth factors [of the preliminary injunction analysis] if the moving party fails to establish either of the first two factors." *Abbott Labs. v. Selfcare, Inc.,* 17 F.Supp.2d 43, 50 (D.Mass.1998) (alterations in original) (quoting *Polymer Techs. v. Bridwell,* 103 F.3d 970, 973–74 (Fed.Cir.1996)). Nevertheless, the Court notes that the public interest would not be served by an order allowing a gambling cruise owner, in a hurry to capture the benefits of the Cape Cod tourist season, to bypass state and local efforts to assess the regional impact of gambling.

#### *ORDER*

Plaintiff's motion for a preliminary injunction (Docket No. 3) is ***DENIED.***

---

**2.** Although plaintiff complained at oral argument that its liquor license for its restaurant has been delayed because of this litigation, there is an inadequate record on this point. In any·event, town counsel for Barnstable stated that the license was likely to issue soon.