**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JIMMY MARTIN; LUCKY STRIKE LLC,
　　　　　*Plaintiffs-Appellants,*

v.

ROBERT STEWART, as Chief of the
South Carolina Law Enforcement
Division; HENRY MCMASTER, as
Attorney General of the State of
South Carolina; RALPH HOISINGTON,
as Solicitor of the Ninth Judicial
Circuit,

　　　　　*Defendants-Appellees.*

No. 06-1829

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
David C. Norton, District Judge.
(2:06-cv-00400-DCN)

Argued: May 24, 2007

Decided: August 29, 2007

Before WILKINSON, MOTZ, and TRAXLER, Circuit Judges.

---

Reversed and remanded by published opinion. Judge Motz wrote the majority opinion, in which Judge Traxler joined. Judge Wilkinson wrote a dissenting opinion.

---

## COUNSEL

**ARGUED:** James Mixon Griffin, Columbia, South Carolina, for Appellants. Clyde Havird Jones, Jr., Senior Assistant Attorney Gen-

eral, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAR-
OLINA, Columbia, South Carolina, for Appellees. **ON BRIEF:**
Richard A. Harpootlian, Columbia, South Carolina, for Appellants.
Henry Dargan McMaster, Attorney General, John W. McIntosh, Chief
Deputy Attorney General, Robert D. Cook, Assistant Deputy Attor-
ney General, OFFICE OF THE ATTORNEY GENERAL OF
SOUTH CAROLINA, Columbia, South Carolina, for Appellees.

---

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

In this case, the district court dismissed federal constitutional chal-
lenges to two South Carolina statutes regulating video poker, on the
ground that *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), mandated
abstention. Because resolution of these challenges neither requires a
court to adjudicate difficult questions of state law, nor disrupts state
efforts to establish through a complex regulatory process a coherent
policy on a matter of substantial public concern, this case falls well
outside the narrow category of cases to which *Burford* abstention may
apply. Accordingly, we reverse the judgment of the district court and
remand the case for further proceedings consistent with this opinion.

I.

The parties do not dispute the material facts. Jimmy Martin and
Lucky Strike, LLC (collectively Martin), brought this action against
three South Carolina officials in their official capacities: Robert Stew-
art, Chief of the State Law Enforcement Division; Henry McMaster,
Attorney General; and Ralph Hoisington, Solicitor of the Ninth Judi-
cial Circuit (collectively the State). Martin sought to enjoin enforce-
ment of two South Carolina statutes criminalizing certain "device[s]
pertaining to games of chance." S.C. Code Ann. §§ 12-21-2710 &
-2712 (2006). Like all statutes regulating "gambling enterprises," such
legislation lies well within "the state's police power." *Johnson v. Col-
lins Entm't Co.*, 199 F.3d 710, 720 (4th Cir. 1999). Martin does not
contend to the contrary, nor does he assert that the South Carolina
statutes violate any *state* law or policy. Rather, Martin maintains that
the challenged statutes violate the Constitution of the United States.

The South Carolina legislature enacted the provisions at issue in a 1999 amendment to South Carolina's gambling laws. *See* 1999 S.C. Acts 1319-23. The first provision, section 12-21-2710,[1] makes it unlawful for a person to "keep on his premises or operate" certain gaming machines, including "device[s] pertaining to games of chance." S.C. Code Ann. § 12-21-2710. A violation of this statute constitutes a misdemeanor, punishable by a fine not to exceed $500, imprisonment for no more than a year, or both. *Id.*

The second challenged provision, section 12-21-2712, directs law enforcement officers to seize machines prohibited by section 12-21-2710 and bring them before a county magistrate. S.C. Code Ann. § 12-21-2712. The magistrate must determine whether the machine

---

[1]Section 12-21-2710 provides in full:

It is unlawful for any person to keep on his premises or operate or permit to be kept on his premises or operated within this State any vending or slot machine, or any video game machine with a free play feature operated by a slot in which is deposited a coin or thing of value, or other device operated by a slot in which is deposited a coin or thing of value for the play of poker, blackjack, keno, lotto, bingo, or craps, or any machine or device licensed pursuant to Section 12-21-2720 and used for gambling or any punch board, pull board, or other device pertaining to games of chance of whatever name or kind, including those machines, boards, or other devices that display different pictures, words, or symbols, at different plays or different numbers, whether in words or figures or, which deposit tokens or coins at regular intervals or in varying numbers to the player or in the machine, but the provisions of this section do not extend to coin-operated nonpayout pin tables, in-line pin games, or to automatic weighing, measuring, musical, and vending machines which are constructed as to give a certain uniform and fair return in value for each coin deposited and in which there is no element of chance.

Any person violating the provisions of this section is guilty of a misdemeanor and, upon conviction, must be fined not more than five hundred dollars or imprisoned for a period of not more than one year, or both.

S.C. Code Ann. § 12-21-2710 (2006).

violates any law and, if it does, order its destruction. *Id.*[2] South Carolina law entitles a machine owner to a post-seizure hearing before a magistrate to determine the machine's legality and to an appeal of that decision to higher courts. *See Mims Amusement Co. v. S.C. Law Enforcement Div.*, 621 S.E.2d 344, 351 (S.C. 2005). No pre-enforcement mechanism exists for testing a particular machine's legality.

Martin filed this action in federal court in the District of South Carolina, asserting that sections 12-21-2710 and 12-21-2712 violate the Equal Protection and Due Process Clauses of the Fourteenth Amendment. Although the district court had federal question jurisdiction to consider these constitutional claims, *see* 28 U.S.C. § 1331 (2000), the State moved to dismiss. Believing the *Burford* doctrine required abstention, the district court granted the motion. *Martin v. Stewart*, 438 F. Supp. 2d 603, 608-09 (D.S.C. 2006). Martin noted a timely appeal and we have jurisdiction to consider this appeal under 28 U.S.C. § 1291 (2000).

We review a district court's decision to abstain under *Burford* for abuse of discretion. *Harper v. Pub. Serv. Comm'n*, 396 F.3d 348, 357-58 (4th Cir. 2005). A district court abuses its discretion whenever "its decision is guided by erroneous legal principles." *United States v. Under Seal (In re Grand Jury)*, 478 F.3d 581, 584 (4th Cir. 2007) (internal quotation marks omitted); *see also Koon v. United States*, 518 U.S. 81, 100 (1996) ("A district court by definition abuses its discretion when it makes an error of law."). Consequently, "there is little or no discretion to abstain in a case which does not meet traditional abstention requirements." *Dittmer v. County of Suffolk*, 146 F.3d 113, 116 (2d Cir. 1998) (internal quotation marks omitted).

---

[2]Section 2712 reads in full:

> Any machine, board, or other device prohibited by Section 12-21-2710 must be seized by any law enforcement officer and at once taken before any magistrate of the county in which the machine, board, or device is seized who shall immediately examine it, and if satisfied that it is in violation of Section 12-21-2710 or any other law of this State, direct that it be immediately destroyed.

S.C. Code Ann. § 12-21-2712 (2006).

## II.

The Supreme Court has repeatedly instructed that "federal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996); *see, e.g.*, *Deakins v. Monaghan*, 484 U.S. 193, 203 (1988) ("[T]he federal courts have a virtually unflagging obligation to exercise their jurisdiction . . . ." (internal quotation marks omitted)); *England v. La. State Bd. of Med. Exam'rs*, 375 U.S. 411, 415 (1964) ("'When a Federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction.'" (quoting *Willcox v. Consol. Gas Co.*, 212 U.S. 19, 40 (1909))); *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821) ("[The Supreme Court] ha[s] no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.").

Abstention doctrines constitute "extraordinary and narrow exception[s]" to a federal court's duty to exercise the jurisdiction conferred on it. *Quackenbush*, 517 U.S. at 716, 728 (internal quotation marks omitted). These exceptions require the denial of discretionary relief when "principles of federalism and comity" outweigh the federal interest in deciding a case. *See id.* at 716, 728. To cabin that discretion and ensure that abstention "remains the exception, not the rule," the Supreme Court has "carefully defined . . . the areas in which such abstention is permissible." *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 359 (1989) (*NOPSI*) (internal quotation marks omitted).

For example, *Younger v. Harris*, 401 U.S. 37 (1971), permits federal courts to abstain from hearing cases that would interfere with a pending state criminal proceeding. Pursuant to *Railroad Commission v. Pullman Co.*, 312 U.S. 496 (1941), courts may abstain when the need to decide a federal constitutional question might be avoided if state courts are given the opportunity to construe ambiguous state law. Another doctrine, articulated in *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25 (1959), allows abstention in cases raising issues "intimately involved with [the State's] sovereign prerogative," where proper adjudication might be impaired by unsettled questions of state law. And in *Burford*, the Court recognized that courts may abstain when the availability of an alternative, federal

forum threatened to frustrate the purpose of a state's complex admin-istrative system. *Burford*, 319 U.S. at 331-32; *see also Quackenbush*, 517 U.S. at 725; *Ala. Pub. Serv. Comm'n v. S. Ry. Co.*, 341 U.S. 341 (1951).

To be sure, these discrete abstention doctrines "are not rigid pigeonholes into which federal courts must try to fit cases." *Pennzoil Co. v. Texaco Inc.*, 481 U.S. 1, 11 n.9 (1987). Overlapping rationales motivate these doctrines and considerations that support abstaining under one will often support abstaining under another. *Id.* But at the same time, the Supreme Court has *never* allowed abstention to be a license for free-form *ad hoc* judicial balancing of the totality of state and federal interests in a case. The Court has instead defined specific doctrines that apply in particular classes of cases. *See NOPSI*, 491 U.S. at 359. In this case, the district court relied solely on *Burford* absten-tion.[3]

The *Burford* doctrine "justif[ies] the dismissal of a federal action" in a "narrow range of circumstances." *Quackenbush*, 517 U.S. at 726. *Burford* permits abstention when federal adjudication would "unduly intrude" upon "complex state administrative processes" because either: (1) "there are difficult questions of state law . . . whose impor-tance transcends the result in the case then at bar"; or (2) federal review would disrupt "state efforts to establish a coherent policy with respect to a matter of substantial public concern." *NOPSI*, 491 U.S. at 361-63 (internal quotation marks omitted). Moreover, the Supreme Court has directed that "*Burford* allows a federal court to dismiss a case only" when presented with these "extraordinary circumstances." *Quackenbush*, 517 U.S. at 726-27. Courts must balance the state and federal interests to determine whether the importance of difficult state

---

[3]The State also moved to abstain on the basis of *Younger*, 401 U.S. 37. The district court did not reach this contention and so, although *Younger* abstention would seem not to apply here, we do not reach the issue either. Moreover, the State has expressly conceded the inapplicability of *Pullman* abstention. *See* Defs.' Reply Br. Supp. Mot. Dismiss 11 ("We are not arguing abstention under [*Pullman*,] which authorizes a federal court to abstain when construction of a state statute may alleviate a con-stitutional concern. No construction of the State's forfeiture of gambling devices statutes is necessary . . . .").

law questions or the state interest in uniform regulation *outweighs* the federal interest in adjudicating the case at bar. *NOPSI*, 491 U.S. at 362. "This balance only rarely favors abstention." *Quackenbush*, 517 U.S. at 728.

The Supreme Court has consistently refused to abstain under *Burford* when neither of these criteria were met. *See, e.g.*, *NOPSI*, 491 U.S. at 361-62 (holding district court abused its discretion in abstaining when no "state-law claim" is involved and adjudication of preemption claim "would not disrupt the State's attempt to ensure uniformity"); *Colo. River Water Conserv. Dist. v. United States*, 424 U.S. 800, 815 (1976) (holding district court abused its discretion in abstaining under *Burford* when "state law to be applied appear[ed] to be settled" and federal adjudication would not "impair efforts to implement state policy"); *McNeese v. Bd. of Educ.*, 373 U.S. 668, 674 (1963) (declining to abstain when "no underlying issue of state law control[s]" and "[t]he right alleged is . . . plainly federal in origin and nature").

We too have limited *Burford* abstention to cases in which these criteria were met. *Compare First Penn-Pacific Life Ins. Co. v. Evans*, 304 F.3d 345, 350 (4th Cir. 2002) (holding abstention proper when federal adjudication would interfere with state receivership proceedings and "disrupt[ ] the state's efforts to provide a unified method" for liquidation of debtor's assets) (internal quotation marks omitted), *and Collins*, 199 F.3d at 720, 723-24 (holding abstention proper when federal adjudication would require federal court to "answer disputed questions of state gaming law that . . . powerfully impact the welfare of [state] citizens" and requested relief would "effectively establish[ ] parallel federal and state oversight of the [state] video poker industry"), *with Harper*, 396 F.3d at 358 (holding district court abused its discretion in abstaining when case "involves [the] vital *federal* question" of whether state law is constitutional and "federal jurisdiction [would not] impede the formation of core state policies"), *Gross v. Weingarten*, 217 F.3d 208, 224 (4th Cir. 2000) (holding abstention improper when case involved no "difficult questions of state law . . . whose importance transcends the result in the case at bar" and federal adjudication "would not [disrupt] state efforts to establish a coherent policy") (internal quotation marks omitted), *and Neufeld v. City of Baltimore*, 964 F.2d 347, 350-51 (4th Cir. 1992) (holding district

court abused its discretion in abstaining when case presented no "difficult questions of state law" and a "federal decision [would not] disrupt the efficacy of an important and coherent state policy").

In sum, a federal court may abstain under *Burford* from its "strict duty to exercise" congressionally conferred jurisdiction, *Quackenbush*, 517 U.S. at 716, only when the importance of difficult questions of state law or the state's interest in uniform regulation outweighs the federal interest in adjudicating the case at bar. The State recognizes that these principles control the abstention inquiry here and, with them in mind, we turn to the case at hand.

## III.

Martin seeks a single remedy: an injunction against the enforcement of sections 12-21-2710 and 12-21-2712. He maintains that these statutes violate his Due Process and Equal Protection rights under the Fourteenth Amendment of the United States Constitution. Specifically, Martin argues that section 12-21-2710, which provides for criminal penalties, is void for vagueness because it fails to give fair notice of forbidden conduct and allows arbitrary enforcement, thus violating the Due Process Clause. He also contends that the failure of both statutes to provide a pre-enforcement mechanism for determining the legality of an amusement device and the State's discriminatory enforcement of these statutes violates the Equal Protection Clause.

These claims present no difficult questions of state law whose importance outweighs the federal interest in adjudicating Martin's constitutional case. Nor do these claims threaten a state interest in uniform regulation that outweighs the federal interest in adjudicating the case. Accordingly, *Burford* does not permit abstention here.

## A.

The Due Process challenge to section 12-21-2710 involves no difficult question of state law because, as the State itself recognizes, and in fact argues, section 12-21-2710 is "well defined by the [Supreme Court of South Carolina's] many interpretations." Brief of Appellees at 37. *See, e.g.*, *Sun Light Prepaid Phonecard Co. v. State*, 600 S.E.2d

61, 64 & n.6 (S.C. 2004) (holding that a device "pertain[s] to [a] game[ ] of chance" because it contains an "element of chance" and is not "part of a legitimate promotion" to sell a product).

Indeed, in *State v. DeAngelis*, 183 S.E.2d 906, 908 (S.C. 1971), the state court rejected a vagueness challenge to precisely the same language — "games of chance of whatever name or kind" — that Martin targets, holding that "[a]n analysis of [the statute's] wording convinces us that a man of reasonable intelligence is given fair notice of the machines proscribed [and that] the statute cannot be used in a capricious or discriminatory manner."[4] Thus, the state law component of a vagueness challenge — whether limiting constructions apply to the language — is settled: the State's highest court has expressly held that the statutory text is to be given its ordinary meaning. The remaining question — whether the statute's ordinary meaning is unconstitutionally vague — is a matter of federal law. Thus, because state law is now "clear and certain," *Burford* abstention is inappropriate. *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 196

---

[4]The dissent makes the exceedingly odd argument that the *DeAngelis* holding that the term "games of chance" must be given its ordinary meaning somehow renders the statute more difficult to interpret and that we engage in "circular" reasoning in holding to the contrary. *See post* at 25. In fact, *DeAngelis* resolves any possible difficult state law question and directs a long recognized mode of statutory construction that federal courts are well equipped to undertake. Equally unavailing is the dissent's suggestion that advances in gambling technology have lessened *DeAngelis*'s significance. *See post* at 24-27. The Supreme Court of South Carolina has specifically rejected an argument that technological changes lessen the force of its prior interpretations of gambling statutes. *See State v. 192 Coin-Operated Video Game Machs.*, 525 S.E.2d 872, 878-79 (S.C. 2000) ("Although slot machines have changed since the 1960s, the substance of [section 12-21-2710] has not. The relevant portions of the current version outlaw the same conduct as its predecessor."). That the South Carolina legislature has revised its gambling statutes without further defining "games of chance," provides additional support for finding *DeAngelis* continues to be authoritative. *Id.* at 879 ("The legislature is presumed to be aware of [the South Carolina Supreme] Court's interpretation of its statutes. If the General Assembly considered [the Court's interpretations] outdated, it could have changed the statute . . . .") (citations omitted).

(1959); *see also Colo. River*, 424 U.S. at 815 (holding case "does not fall within" *Burford* doctrine when state law "appears to be settled").

For similar reasons, Martin's discriminatory enforcement claim presents no difficult question of state law. To prevail on that claim, Martin must demonstrate that (1) he was similarly situated to persons not prosecuted; and (2) a discriminatory purpose motivated this different treatment. *See United States v. Armstrong*, 517 U.S. 456, 465-66 (1996). The first inquiry requires a court to determine which video poker machines are prohibited by statute, but such an inquiry hardly involves a *difficult* state law question given that *DeAngelis* held that "a [person] of reasonable intelligence is given fair notice of the machines proscribed." 183 S.E.2d at 908. If the district court should determine that state law enforcement treats parties similarly situated under the statute differently, the remaining question is purely federal — whether an impermissible purpose motivated this different treatment.

Finally, Martin's claim regarding the lack of a pre-enforcement mechanism for determining a machine's legality presents no state law question at all because indisputably South Carolina provides no pre-enforcement mechanism. Thus, resolving this claim involves no interpretation of any state law, but only the determination of whether settled South Carolina law violates federal constitutional rights. Therefore, none of Martin's challenges presents difficult questions of state law, let alone difficult questions whose importance outweighs the federal interest in adjudicating Martin's claims.[5]

B.

Nor do any of Martin's claims threaten a state interest in uniform regulation. Martin launches a *facial* attack on the state statutes *as a*

---

[5]Martin presses, perhaps without having pled, a claim that the lack of a preenforcement mechanism violates the Due Process Clause under *Ex Parte Young*, 209 U.S. 123 (1908). In any event, this claim neither presents a difficult question of state law (the statute indisputably lacks such a mechanism) nor threatens the State's interest in uniformity (if successful, all enforcement will be enjoined). Consequently, the district court erred by applying *Burford* abstention to this claim.

*whole* — precisely the sort of case federal courts often and expertly entertain. *See Alliance of Am. Insurers v. Cuomo*, 854 F.2d 591, 601 (2d Cir. 1988) (declining to abstain under *Burford* when "case is a direct challenge to the constitutionality of a state statute, a controversy federal courts are particularly suited to adjudicate"). If Martin should succeed, the district court would enjoin all enforcement of the statutes at issue; such relief could not possibly threaten their *uniform* application.[6]

Moreover, contrary to the State's suggestion, Brief of Appellees at 20, "there is, of course, no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of a state policy." *Zablocki v. Redhail*, 434 U.S. 374, 379-80 n.5 (1978). Therefore, "the threat that the federal courts might decide the entire state system unconstitutional is not a valid justification for *Burford* abstention." *Neufeld*, 964 F.2d at 351. Rather, this "sort of risk is present whenever one attacks a state law on constitutional grounds in a federal court." *Bath Mem. Hosp. v. Me. Health Care Fin. Comm'n*, 853 F.2d 1007, 1013 (1st Cir. 1988).

As then-Judge Breyer explained in refusing to abstain from deciding similar constitutional challenges to several state statutes:

> The plaintiffs do not seek individualized review of fact- (or cost-) specific regulatory decision making. To the contrary, they attack the statute as it is written. Permitting a federal court to decide this kind of constitutional claim would not interfere significantly with the workings of a lawful state system, as such intervention threatened in *Burford* . . . .

---

[6]The dissent frets that litigation of Martin's discriminatory enforcement claim will require "discovery [that] would put South Carolina's regulatory regime through the wringer," *post* at 28, but cites no authority for the proposition that normal discovery burdens can justify *Burford* abstention. Moreover, Martin cannot obtain any discovery on his discriminatory enforcement claim unless he makes a "credible showing" that no "legitimate prosecutorial factor" separates his operations from those not prosecuted, *United States v. Khan*, 461 F.3d 477, 498 (4th Cir. 2006).

*Id.* at 1014.

Justice Breyer's words reflect an important distinction, which the State fails to recognize, between federal claims that rest on an alleged predicate violation of state law and those that do not. Federal claims that rest on allegations that a state agency or private actors violated state law can sometimes undermine a state's efforts to regulate uniformly — if the federal court interprets state law differently than the state enforcement agency or the state forum that would otherwise hear the dispute. When a "federal" claim rests on a violation of state law, we consider it a "state law [claim] in federal law clothing." *Collins*, 199 F.3d at 721 (internal quotation marks omitted). Because of the diminished federal interest in adjudicating such claims and the heightened threat they pose to uniform state regulation, federal courts have less interest at stake in adjudicating such claims and often abstain in such cases. *Id.*; *see, e.g.*, *Burford*, 319 U.S. at 317 (due process claim that state agency unreasonably applied state law); *Collins*, 199 F.3d at 722 (civil RICO claim dependent on violations of state law for predicate acts).

But federal claims, like those at issue here, which do not rest on finding a violation of state law, are federal not only in "clothing," but also in fact. Such claims are "plainly federal in origin and nature," are independent of any state law violation, and do not threaten uniform state regulation. *McNeese*, 373 U.S. at 674. The *Burford* doctrine does not permit a federal court to abstain from deciding them. *See, e.g.*, *id.*; *NOPSI*, 491 U.S. at 362, 364 (holding "*Burford* abstention is not justified" when "primary claim" is that state body violated "federal law"); *Harper*, 396 F.3d at 358 (holding that "[a]pplying *Burford* here was inappropriate" because, unlike *Collins*, 199 F.3d at 719, case "involves a vital *federal* question" — the constitutionality of a state statute); *Neufeld*, 964 F.2d at 350 (holding *Burford* did not apply to claims challenging state statute on federal constitutional grounds).

Because Martin's claims neither involve difficult questions of state law nor threaten a state interest in uniform regulation, the *Burford* doctrine does not justify abstention here.

IV.

Notwithstanding the State's agreement as to the undisputed material facts and its acknowledgment of controlling legal principles, it

insists that *Burford* does require abstention in this case. The State's position rests on two fundamental errors: (1) a serious mischaracterization of Martin's claims and (2) an equally serious misreading of our opinion in *Collins*.

## A.

First, the State iterates and reiterates that Martin seeks to have "classes and categories of machines declared 'legal' under South Carolina law" or to have a federal court "replace [South Carolina's forfeiture system] with a method of [Martin's] own choosing." Brief of Appellees at 3. These assertions, repeated at oral argument and at least ten times in the State's brief, *see id.* at 2, 3, 9, 10, 14, 21, 50, 53, are simply not accurate. Martin seeks only "injunctive relief prohibiting the enforcement of" two state statutes, which he claims violate the United States Constitution.

This would be a different case if Martin had, in fact, sought a federal declaration that specific machines were lawful under South Carolina law or a federal injunction seeking replacement of the State's forfeiture mechanism with one of the court's design. In such circumstances, adjudication of Martin's claims might lead a federal court to "effectively commandeer[ ] South Carolina's enforcement efforts." *Collins*, 199 F.3d at 723. But, like the plaintiffs in a case in which the Second Circuit recently reversed a district court's dismissal on *Burford* grounds, Martin does not "collateral[ly] attack . . . a final determination" made by any state administrative agency "or seek to influence a state administrative proceeding." *Dittmer*, 146 F.3d at 117. Rather, like those plaintiffs, Martin presents only "a direct facial attack on the constitutionality of a state statute," the kind of "controversy federal courts are particularly suited to adjudicate." *Id.* (internal quotation marks omitted); *see also Baran v. Port of Beaumont Navig. Dist.*, 57 F.3d 436, 442 (5th Cir. 1995) (holding "facial challenge" to state statute on federal constitutional grounds does not implicate "the policy concerns of *Burford*" and so "abstention under that doctrine would be inappropriate"). In sum, Martin's actual claims, unlike the fictional ones described by the State, are not proper candidates for *Burford* abstention.

## B.

Moreover, and just as significantly, the State misreads *Collins*. To be sure, in *Collins* we properly recognized that "[t]he regulation of gambling enterprises lies at the heart of the state's police power," 199 F.3d at 720, and the case at hand, like *Collins*, involves state regulation of gambling.

But we did not abstain in *Collins because* it involved the regulation of that important state interest. Abstention on that basis would be improper. Neither *Collins* nor any other case holds that *Burford* abstention is appropriate whenever federal litigation affects an important state interest. Indeed, both the Supreme Court and this court have specifically rejected the view that a strong state interest alone could justify *Burford* abstention. *See County of Allegheny*, 360 U.S. at 191-92 (rejecting the suggestion that "abstention is justified . . . any time a District Court is called on to adjudicate a case involving the State's power of eminent domain"); *Educ. Servs., Inc. v. Md. State Bd. for Higher Educ.*, 710 F.2d 170, 173 (4th Cir. 1983) (acknowledging "the important and sensitive nature of state educational regulation," but holding "*Burford* abstention rests on additional concerns beyond the mere presence of an important state administrative regime, concerns not present here"); *see also Hachamovitch v. De Buono*, 159 F.3d 687, 698 (2d Cir. 1998) (noting "numerous cases have indicated that *Burford* abstention is not required even in cases where the state has a substantial interest if the state's regulations violate the federal constitution").

Instead, we abstained in *Collins* because we concluded that the criteria for *Burford* abstention were met. That is, (1) federal adjudication there would require a federal court to "answer disputed questions of state gaming law that . . . powerfully impact the welfare of [state] citizens" and (2) the relief sought would "effectively establish[ ] parallel federal and state oversight of the [state] video poker industry." *Collins*, 199 F.3d at 720, 723-24.[7]

---

[7]We concluded that the district court order reviewed in *Collins* "effectively commandeered [the State's] enforcement efforts" by "impos[ing] on [the defendant video poker operators] an extensive set of requirements." *Id.* at 718, 723. We noted as an example that "the district court mandated that defendants post a designated 'clarifying sign' on each video poker machine" and required detailed record keeping. *Id.* at 718.

In contrast, federal adjudication in this case would not require a federal court to "answer disputed questions of state law," nor would the relief sought establish "parallel federal and state oversight." Although the statutes challenged here regulate gambling, unlike *Collins*, issues of federal law — the constitutionality of those statutes under the Fourteenth Amendment — dominate this action. As we recognized in *Harper*, 396 F.3d at 358, *Burford* abstention is "inappropriate" in such a situation. In *Harper* we contrasted *Collins*, in which "issues of state law . . . dominated," with a case involving precisely the same kind of "vital *federal* question" as that at issue here — a challenge to the constitutionality of a state statute. *Id.* (internal quotation marks omitted). We concluded that the district court had abused its discretion in abstaining in such a case. *Id.* So it is here.

Contrary to the State's apparent belief, *Collins* did not create a "video-poker abstention" doctrine that forever insulates South Carolina statutes regulating gambling from federal constitutional challenge. The district court abused its discretion in abstaining here under *Burford* because adjudication of Martin's claims, unlike the claims advanced in *Collins*, neither presents difficult questions of state law whose importance transcends the case at bar, nor threatens the State's interest in uniform regulation.

## V.

Although the dissent concedes that "abstention must be carefully cabined," *post* at 32, and takes no issue with our statement of the *Burford* doctrine, it would hold that the district court properly abstained here. It relies on factors totally irrelevant to the "extraordinary and narrow" *Burford* doctrine, *e.g.*, the absence of a federal gambling statute, the effect of the Fourteenth Amendment and 42 U.S.C. § 1983 (2000) on federal-state relations, the history of gambling regulation, the burdens of discovery, and the alleged federalization of gambling policy. The dissent fails to apply the actual *Burford* doctrine because it cannot — if it did so it would have to hold that the district court abused its discretion in abstaining here.

The dissent's analysis appears to be motivated by its preference that cases like Martin's be brought in state court. *See, e.g., post* at 18 ("I see no indication in this case that the South Carolina state courts

have defaulted in any fashion on their obligation to entertain federal constitutional challenges to the operation of state gambling laws."); *id.* at 31 ("[T]he sky will not fall whenever state courts resolve a federal question."). Although we share the dissent's respect for our state colleagues, "'[w]hen a Federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction . . . . The right of a party plaintiff to choose a Federal court where there is a choice cannot be properly denied.'" *England*, 375 U.S. at 415 (quoting *Willcox*, 212 U.S. at 40) (omission in original). Martin chose to file his claims in a federal forum created by Congress — we cannot deny him that choice even if we disagree with it.

Because Martin's claims do not meet the "extraordinary and narrow" criteria for *Burford* abstention, the judgment of the district court is

*REVERSED AND REMANDED.*

WILKINSON, Circuit Judge, dissenting:

There are few decisions more central to state authority than whether to allow legalized gambling, how extensively, and under what terms. Plaintiffs' lawsuit calls for both the interpretation of state law at the heart of the state's regulatory scheme and an extensive inquiry into the state's enforcement practices. While plaintiffs may certainly challenge South Carolina's exercise of its police powers as unconstitutional, the district court was within its authority to conclude that plaintiffs' constitutional challenge would be most properly heard in state court.

Congress has given no indication that it wishes to sweep most federal challenges to state gambling policy into federal court. I do not believe that the general grant of federal concurrent jurisdiction in 42 U.S.C. § 1983 manifests any congressional intention to abrogate the discretion of federal district courts to defer under *Burford* to the complex state administrative and judicial mechanisms involved in regulating gambling enterprises.

And it is not only congressional intent that I believe has been offended. In holding that the district court abused its discretion by

abstaining, the majority diminishes the capacity of trial courts to perform the judicious balancing that lies at the heart of any exercise of equitable discretion. The majority also disrespects the role of state courts: while we properly defer to federal administrative agencies under *Chevron* Step Two, somehow the federal courts are now to be prohibited from showing even a lessened deference to state administrative and judicial systems operating in their own areas of expertise. Further, because federal courts will make an understandable effort to avoid inconsistency and interference with the states, the majority approach will also in time shortchange litigants. Finally, the majority diminishes the values of our federal system, which can hardly be served in this most traditional area of state competence by having the federal appellate courts call the shots. I am at a loss to understand what aims of law are furthered when the federal circuit courts undercut the legitimate institutional interests of so many other actors within our legal system.

This dispute is not confined simply to the case at hand. It touches on the basic application of abstention principles to state regulatory regimes in the most sensitive areas of state sovereignty — an issue that has been rife with conflicting approaches. "[L]ower courts continue to disagree as to when [*Burford*] abstention is appropriate." Erwin Chemerinsky, *Federal Jurisdiction* § 12.2, at 784-85 & nn. 108-09 (4th ed. 2004). "Confusion over the scope of *Burford* abounds . . . ." Gordon G. Young, *Federal Court Abstention and State Administrative Law from Burford to Ankenbrandt*, 42 DePaul L. Rev. 859, 866 (1993).

In the gambling context, specifically, similar confusion reigns, with some courts refusing to abstain, and others deciding abstention is appropriate when a federal court is confronted with challenges to state gambling laws. *Compare Hotel & Rest. Employees & Bartenders Int'l Union Local 54 v. Danziger*, 709 F.2d 815 (3d Cir. 1983), *judgment vacated on other grounds by Brown v. Hotel & Rest. Employees & Bartenders Int'l Union Local 54*, 468 U.S. 491 (1984)(refusing to apply *Burford* abstention to challenges to portions of state gambling scheme); *Turf Paradise, Inc. v. Ariz. Downs*, 670 F.2d 813 (9th Cir. 1982)(same) *with Johnson v. Collins Entm't Co.*, 199 F.3d 710 (4th Cir. 1999)(abstaining under *Burford* from deciding challenges to state gambling regime); *G2, Inc. v. Midwest Gaming, Inc.*, 485 F.Supp.2d

757 (W.D.Tex. 2007) (same); *Metro Riverboat Assocs., Inc. v. Bally's Louisiana, Inc.*, 142 F.Supp.2d 765 (E.D.La. 2001)(same); *Diamond Game Enter. v. Howland*, 1999 WL 397743 (D.Or. 1999)(same). While factual differences no doubt exist between these cases, there is a basic divide between those who believe *Burford* abstention has some modest utility in the face of constitutional challenges to state regulatory regimes and those who do not.[1]

I see no indication in this case that the South Carolina state courts have defaulted in any fashion on their obligation to entertain federal constitutional challenges to the operation of state gambling laws. I see no way in this case to avoid the interpretation of difficult questions of state law and interference with state regulatory policies. I see no sign in this case that interpretation of the terms of any federal statute involving gambling is at issue or that Congress has done anything to remove the choice among different approaches to gambling regulation from its historic venue in the states.

Given the absence of any specific manifestation of congressional jurisdictional intent in the area of gambling, I remain unconvinced that the general expression of federal jurisdictional authority pursuant to § 1983 is enough to divest district courts of their discretion to accord respect to state regulatory choices regarding gaming policy and state court review of those choices. While I recognize that the Fourteenth Amendment and § 1983 re-ordered federal and state relationships (including the relationships between federal and state courts) in the most fundamental way, I do not think it re-ordered these relationships to such an extent as to render *Burford* abstention virtually inapplicable to all constitutional challenges in federal court to

---

[1]Lower courts have also abstained from deciding cases involving state gambling schemes under other abstention doctrines. *See Taylor v. Siegelman*, 230 F.Supp.2d 1284 (N.D. Ala. 2002)(abstaining from plaintiffs' challenge to state gambling statute under *Younger v. Harris*, 401 U.S. 37 (1971)); *Club Ass'n of W.Va., Inc. v. Wise*, 156 F.Supp.2d 599 (S.D.W.Va. 2001) (abstaining from a challenge to state gambling statutes under *R.R. Comm'n of Texas v. Pullman Co.*, 312 U.S. 496 (1941)); *Chun v. State of New York*, 807 F.Supp. 288 (S.D.N.Y. 1992)(abstaining from a challenge to state gambling scheme under both *Pullman* and *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943)).

specialized state regulatory regimes. I see nothing to justify the majority's holding that no reasonable district court could, in these circumstances, stay its hand.

I.

Federal courts have reason to tread cautiously in addressing a state's regulation of gambling, because such schemes of regulation lie at "the heart of the state's police power." *Collins*, 199 F.3d at 720. In fact, few activities have been so consistently treated as being at the core of state sovereignty. *Id.* South Carolina, in particular, has long exercised its police power in this area, developing over time a complex and comprehensive system to regulate gambling activity.

A.

The Supreme Court has treated the regulation of gambling as a quintessential state function for more than a century. *See United States v. Edge Broad. Co.*, 509 U.S. 418, 426 (1993); *Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 341 (1986); *Marvin v. Trout*, 199 U.S. 212, 224 (1905). Our circuit has recognized police power authority in this area time and again. *See, e.g.*, *Helton v. Hunt*, 330 F.3d 242, 246 (4th Cir. 2003); *Casino Ventures v. Stewart*, 183 F.3d 307, 310 (4th Cir. 1999). The authority of the states as to gambling is a matter of broad consensus among our sister circuits. *See Gulfstream Park Racing Ass'n v. Tampa Bay Downs, Inc.*, 399 F.3d 1276, 1278 (11th Cir. 2005) ("The regulation of gambling lies at 'the heart of the state's police power.'") (quoting *Collins*, 199 F.3d at 720); *United States v. Washington*, 879 F.2d 1400, 1401 (6th Cir. 1989) ("The enactment of gambling laws is clearly a proper exercise of the state's police power in an effort to promote the public welfare."); *Medina v. Rudman*, 545 F.2d 244, 251 (1st Cir. 1976) (same); *Boynton v. Ellis*, 57 F.2d 665, 666 (10th Cir. 1932) (same).

State control over gambling has also been reinforced by Congress. While federal interests may sometimes be affected by gambling — as, for instance, when casinos are established on Indian reservations or in United States waters — Congress has generally "sought to extend,

not curb, state police power in this field." *Casino Ventures*, 183 F.3d at 311.

In exercising their police power, states may reasonably conclude that gambling brings an "increase in local crime, the fostering of prostitution, the development of corruption, and the infiltration of organized crime." *Posadas*, 478 U.S. at 341. They may also conclude that gambling fosters addiction and exploits human weakness, drawing down the assets of those who can least afford to gamble money away. *See Collins*, 199 F.3d at 720; *Posadas*, 478 U.S. at 341.

At the same time, states often invoke the police power to control gambling rather than prohibit it. States may well conclude that permitting gambling enhances public welfare by allowing citizens free choice in their recreational pursuits and by spurring economic growth through gambling-related business enterprises. In addition, gambling can generate tax revenue that may fund schools, public works, and other government programs. *See Collins*, 199 F.3d at 720. States may also conclude that legalized gambling is a lesser evil, believing the activity's harms can best be harnessed when the activity is subject to regulation and kept in plain view.

The diversity of views towards gambling has given rise to schemes of regulation that are nearly as varied as the states establishing them. Several states — Utah and Hawaii, for example — forbid commercial gambling altogether. *See* Utah Const. Art. VI, § 27; Hawaii Rev. Stat. § 712-1223 (2006). Many others — more than two-thirds, as of 1999 — allow government-controlled gambling in the form of lotteries. *National Gambling Impact Study Commission Final Report* ("*NGISC Report*") (1999), *available at* http://govinfo.library.unt.edu/ngisc/reports/fullrpt.html, Page 2-1 (last visited July 19, 2007). Some states, such as Nevada, New Jersey, and Mississippi, have gone further, permitting privately run gambling within their borders. And there are variations even among these. Nevada, for instance, allows slot machines virtually anywhere, including at airports and supermarkets. On the other hand, Mississippi and New Jersey concentrate legalized gambling in limited areas, the former restricting gambling to coastal counties and riverboats, and the latter restricting gambling to Atlantic City alone. *NGISC Report* 2-4; 2-7; 3-5. Regardless of the particular scheme, states that allow legalized gambling impose a unique mix of

controls on gambling venues, including licensing requirements, number, size, and type of site standards, and advertising limitations.

I would be hard-pressed to identify any field of regulation about which there is broader or deeper consensus on the appropriateness of state control.

## B.

For decades, the South Carolina General Assembly has sought to balance "the revenue gained from licensing and taxation of [gambling] against the social costs of gambling addiction." *Collins*, 199 F.3d at 716. In doing so, the General Assembly has tried a number of plans to determine the appropriate level of gambling control, and has developed numerous mechanisms to enforce its regulations. The South Carolina General Assembly initially banned all gambling, with the exception of "coin operated nonpayout machines with a free play feature" as long as the machines did not disburse "money or property" to a player. S.C. Code Ann. § 16-19-60 (Law. Co-op. 1976) (amended to delete the word "property," *see* Act effective June 18, 1986, Part II, § 26(B), S.C. Acts 540). The state later experimented with legalized electronic gambling from 1982 to 2000, exempting "video games with a free play feature" from prohibition. 1982 S.C. Act No. 466.[2] And in *State v. Blackmon*, 403 S.E.2d 660, 661-62 (S.C. 1991), the South Carolina Supreme Court held that nonmachine cash payouts from these video gaming machines were legal under S.C. Code Ann. § 16-19-60 (Supp. 1999).[3]

Such machines are now once again forbidden by South Carolina law. It is presently "unlawful for any person to keep on his premises or operate or permit to be kept on his premises or operated within this State" certain gambling devices. The devices prohibited include "any vending or slot machine, or any video game machine with a free play

---

[2]Codified as S.C. Code Ann. § 52-15-10 and subsequently recodified as § 12-21-2710. In 1997, this section was amended to limit the exemption to those video games "which meet the technical requirements provided for in Section 12-21-2782 and Section 12-21-2783." 1997 S.C. Act No. 155, Pt. II, § 54(B).

[3]Repealed effective July 1, 2000, by 1999 S.C. Act No. 125, Pt. I, § 8.

feature operated by a slot in which is deposited a coin or thing of value, or other device operated by a slot in which is deposited a coin or thing of value for the play of poker, blackjack, keno, lotto, bingo, or craps" as well as "any punch board, pull board, or other device pertaining to games of chance of whatever name or kind . . . ." S.C. Code Ann. § 12-21-2710 (2006).

South Carolina has long employed a multi-tiered regulatory structure — comprised of legislative, executive, administrative, and judicial mechanisms — to enforce its gambling laws. Currently, no fewer than five different state entities are part of this effort. First, State Law Enforcement Division (SLED) officers have the authority to enforce South Carolina's gaming statutes. *See* S.C. Code Ann. § 23-3-15 (2006). According to plaintiffs, at least one SLED officer has received specialized training on whether a particular video game machine qualifies as a "game of chance."

Second, the South Carolina Attorney General issues opinion letters that construe the statutory scheme and provide guidance to SLED officers. *See, e.g.*, Letter from Attorney General Charles M. Condon to South Carolina Law Enforcement Division Chief Robert M. Stewart (May 8, 2000), *available at* www.sctax.org/Publications/vg/opn5800.pdf (last visited July 19, 2007).

Third, after SLED officers seize machines they consider to be in violation of state law, the devices are brought before state magistrates. These magistrates, who have expertise in the particulars of South Carolina's gaming laws, "immediately examine" each machine and make a determination of their legality as the machines are configured at that time. *See* S.C. Code Ann. § 12-21-2712 (2006); *Allendale County Sheriff's Office v. Two Chess Challenge II*, 606 S.E.2d 471 (S.C. 2004). These magistrates provide specialized review of the machines, determining whether they constitute an illegal "game of chance" under § 12-21-2710, the very provision a federal court would need to interpret to evaluate plaintiffs' claims. Further, the magistrates serve to place "some restraint" upon law enforcement officers "who represent the executive authority of the state . . . ." *State v. Kizer*, 162 S.E. 444, 449 (S.C. 1932), *overruled on other grounds by State v. 192 Coin-Operated Video Game Machs.*, 525 S.E.2d 872 (S.C. 2000).

Fourth, a machine owner may appeal a magistrate's decision through the state court system, which has heard scores of cases defining the contours of the state's gambling laws. *See, e.g.*, *192 Coin-Operated Video Game Machs.*, 525 S.E.2d 872; *Westside Quik Shop Inc. v. Stewart*, 534 S.E.2d 270 (S.C. 2000), *overruled in part by Byrd v. City of Hartsville*, 620 S.E.2d 76 (S.C. 2005); *Joytime Distribs. & Amusement Co. v. South Carolina*, 528 S.E.2d 647 (S.C. 1999); *Johnson v. Collins Entm't Co.*, 508 S.E.2d 575 (S.C. 1998); *Martin v. Condon*, 478 S.E.2d 272 (S.C. 1996); *Blackmon*, 403 S.E.2d 660.

Fifth, the South Carolina Department of Revenue issues biannual licenses to owners of video game machines that remain legal. *See* S.C. Code Ann. § 12-21-2720 (2006) (allowing video machines, with a license, for the playing of music, kiddy rides, "machines for the playing of amusements or video games, without a free play feature, or machines of the crane type operated by a slot . . . and a machine for the playing of games or amusements, which has a free play feature, operated by a slot . . . and the machine is of the nonpayout pin table type with levers or 'flippers' operated by the player in which the course of the balls may be altered or changed . . . ."). In sum, South Carolina has established a specialized scheme to interpret and enforce laws that lie at the center of state sovereignty.

II.

As the district court recognized, abstention was warranted here because plaintiffs' lawsuit threatens to trammel South Carolina's highly reticulated regulatory regime. Plaintiffs raise three claims. First, they assert that § 12-21-2710's prohibition against possessing any "device pertaining to games of chance of whatever name or kind" is void for vagueness. Second, plaintiffs challenge South Carolina's gambling scheme on equal protection grounds, asserting that they are "being subjected to discriminatory enforcement of the laws pertaining to video game machines. . . ." *Brief of Appellants* at 5. Finally, plaintiffs challenge the post-seizure procedure by which South Carolina determines the legality or illegality of a particular video gaming device. The district court was entitled to abstain from deciding these claims, for reasons I shall discuss in turn.

## A.

Plaintiffs first claim that the provision forbidding "devices pertaining to games of chance of whatever name or kind" is void for vagueness on the theory that "its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Specifically, plaintiffs contend that this provision could be read to outlaw Monopoly, simple card games, and personal computer and cell phone games such as minesweeper and solitaire. *See Brief of Appellants* at 5. While I emphatically do not embrace the proposition that every vagueness challenge to a state statute in federal court warrants abstention, neither do I subscribe to the view that every unclear question of state law forecloses abstention in favor of a federal vagueness challenge. Contrary to the majority's contention that plaintiffs' challenge "involves no difficult question of state law," *ante* at 8, plaintiffs' claim that "games of chance" is "not clearly defined" is certainly plausible enough that the district court's decision to abstain cannot be considered an abuse of discretion. Indeed, federal court involvement here will interfere with the detailed, individualized analysis required to determine what constitutes a "game of chance" and will inescapably intrude upon South Carolina's regulatory system.

In this case, in order to evaluate plaintiffs' vagueness challenge, the federal court would have to define "games of chance," a task it cannot complete without delving into the "meaning, interpretations, and the general regulatory context" of § 12-21-2710. *Martin v. Stewart*, 438 F.Supp.2d 603, 607 (D.S.C. 2006). The meaning and precise application in any given case of "games of chance" lie at the core of South Carolina's regulation of gaming; interpreting this provision would therefore enmesh the federal court in a question of state law that bears not simply on a "policy problem[ ] of substantial public import," *New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans* ("NOPSI"), 491 U.S. 350, 361 (1989), but arguably on "the most hotly contested issue in South Carolina in recent years." *Collins*, 199 F.3d at 715.

The majority's conclusion that no "difficult question of state law" is presented here is astounding, insofar as its basis is the South Carolina Supreme Court's 1971 holding that "a man of reasonable intelligence is given fair notice of the machines proscribed" by the

provision. *Ante* at 10 (citing *State v. DeAngelis*, 183 S.E.2d 906, 908 (1971)). While the majority says that the statutory text is "clear and certain" because it is given its "ordinary meaning," *ante* at 9, that circular formulation begs the question of what its ordinary meaning even is. Further, such highly generalized formulations of the provision's meaning elide every difficult question the state courts must face when interpreting and applying § 12-21-2710. Far from being "clear and certain," the provision outlawing "games of chance" is one that South Carolina state courts must apply, on a machine-by-machine basis, to a complex and ever-changing cadre of gambling technology. Indeed, the development of video gaming machine technology and of the state courts' application of § 12-21-2710 to that technology demonstrate that the meaning and treatment of "games of chance" present "difficult questions of state law" from which the district court legitimately abstained.

For starters, not even primitive versions of the video gaming machines involved in this case were in existence at the time of *DeAngelis*. Such machines did not become commercially viable until the mid- to late-1970s, when it first became economical to combine a television-like monitor with a central processing unit. In fact, it was not until Si Redd's Coin Machines (SIRCOMA) introduced *Draw Poker* in 1979 that such devices gained any measure of popularity. *See* Ireck Galecki, "Video Poker History," Dec. 6, 2006, *available at* http://onlinecasinopress.co.uk/video-poker-history.html (last visited July 19, 2007); *see also* "History of Video Slot Machines," *available at* http://www.videoslotmachines.com/history.htm (last visited July 19, 2007); "History of Video Poker," *available at* http://www.videopoker247.com/history.html (last visited July 19, 2007). Although the language "games of chance" can be found in the gaming statute as of 1971, S.C. Code Ann. § 5-621 (Code 1962), and the current statute, S.C. Code Ann. § 12-21-2710, the former was not part of a larger statutory provision that includes reference to any type of video gaming device. And although the majority is correct that "slot machines have changed since the 1960s, [while] the substance of [section 12-21-2710] has not," the difficult task of distinguishing lawful from unlawful games has been complicated dramatically by these technological developments. *Ante* at 9, n.4 (citing *192 Coin-Operated Video Game Machs.*, 525 S.E.2d at 878-79). In fact, technological developments in the thirty-six years since *DeAngelis* bear very

directly on the line of demarcation between prohibited "games of chance" and permitted "games of skill." Indeed, what may have been clear to a "man of reasonable intelligence" regarding this distinction in 1971 can simply no longer be so. The legality of a particular machine must be determined on an individual basis at the time of seizure, because "video machines may be manipulated so as to change their nature from lawful to unlawful . . . ." *Allendale County Sheriff's Office*, 606 S.E.2d at 474.

Not surprisingly, evaluations of these machines are quite detailed. For example, after a thorough examination of two Chess Challenge II game machines, the magistrate judge in *Allendale County* found the games lawful, relying in part on a detailed affidavit which explained, "the Chess Challenge II game operates in a different manner from the illegal games of chance . . . . Chess Challenge II operates utilizing a repeating pattern and does not utilize features that would prevent a player's skill from determining the outcome of the game. In addition, a player is able to identify the icons as they appear, and to time the stopping of the game to increase the chance of winning." *Id.* at 472, n.1.

And in *Sun Light Prepaid Phonecard Co., Inc. v. State*, 600 S.E.2d 61, 64 (S.C. 2004), the South Carolina Supreme Court held that machines dispensing pre-paid, long distance telephone cards with attached game pieces constituted illegal gambling devices, because a detailed evaluation revealed that the machines (1) housed a video screen with a gambling theme; (2) played celebration music after dispensing a winning game piece; (3) froze if a pre-determined level of prize money was attained; (4) contained two meters: one which recorded the amount of money entering the machine and one (labeled "WON") which "record[ed] the value of the prizes issued by the machines"; (5) lacked a mechanism for returning change; and (6) could be linked with other machines. *Id.* at 63.

My friends in the majority, however, refuse to allow the state courts to undertake the delicate task of distinguishing between lawful and unlawful games. Because South Carolina's gaming statutes justifiably call for a machine-by-machine determination of legality, the majority's notion that it somehow can interpret "games of chance" in bulk, without disrupting South Carolina's enforcement scheme, rides

roughshod over the scheme itself and the principles of federalism it purports to observe.

It is thus no simple task for the South Carolina courts to interpret and apply § 12-21-2710, which is entrenched in a highly reticulated regulatory scheme, to a range of ever-changing, technologically advanced devices. The majority's insistence that the district court abused its discretion in abstaining, however, will complicate state tasks immeasurably. It threatens to "disrupt the State's attempt to ensure uniformity in the treatment of an 'essentially local problem.'" *NOPSI*, 491 U.S. at 362. *Burford* abstention exists to "protect[ ] complex state administrative processes from undue federal interference." Indeed, a case like this one, in which the federal court is called upon to resolve a "difficult question[ ] of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar," provides a paradigmatic example of the circumstances justifying *Burford* abstention. *NOPSI*, 491 U.S. at 361 (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 814 (1976)). To say the district court abused its discretion in abstaining is beyond erroneous.

## B.

Plaintiffs also mount an equal protection challenge to South Carolina's gaming laws. Plaintiffs argue that because video gaming machine owners are unable to obtain pre-enforcement review of the legality of their business pursuits like other entrepreneurs can, South Carolina makes use of "an arbitrary, capricious classification that is not rationally related to the purposes of the statute." *Complaint* at 10, par. 38. Further, plaintiffs contend that they are "being subjected to discriminatory enforcement of the laws pertaining to video game machines . . . in an effort to restrict Plaintiffs' meaningful participation in the political process in South Carolina." *Id.*, par. 39.

The majority asserts that plaintiffs merely "launch a *facial* attack on the state statutes *as a whole*," thus presenting a case federal courts "often and expertly entertain." *Ante* at 10-11. Such antiseptic treatment of plaintiffs' claim, however, exalts form over substance and gives short shrift to the essence of plaintiffs' challenge — namely that the statute is being enforced against them in a discriminatory manner.

*See Complaint* at 10, par. 39. Simply describing a challenge as facial does not necessarily make it so. Instead, courts must look to the underlying import of the claim, not just to incantation of magic words and labels. Here, plaintiffs clearly desire to sift through South Carolina's entire gambling enforcement scheme, to probe all its intricate details in the name of discovery. *See Brief of Appellants* at 8-9. Rather than recognizing the claim for what it actually is, the majority accepts what it misguidedly purports to be.

By turning a blind eye to this claim's true character, the majority's approach threatens one of two possible consequences, neither of which is appealing. First, if the district court treats this as a true facial challenge, rather than what plaintiffs desire it to be — an as-applied challenge in the guise of a facial attack — plaintiffs' claim will have been unfairly decapitated. Under a facial challenge, plaintiffs can only attack the statutory provision in the abstract, not ascertain whether it could be enforced, discriminatorily or otherwise, against particular machines — their true concern. This result leaves plaintiffs in the unenviable position of wanting to be in federal court one day, but not the next. At the same time, the majority sends the troubling message to district courts that they can skirt potential abstention problems by characterizing claims such as this as mere facial challenges. Thus, in an effort to avoid interference with state law, federal courts may construe complaints to present less serious challenges than they in fact do.

The second potential consequence stems from the majority's failure to anticipate how plaintiffs intend for this litigation to unfold. Despite the "facial" label applied to their discriminatory enforcement claim, plaintiffs' requested discovery here would put South Carolina's regulatory regime through the wringer. And as the suit moves forward, the district court will assuredly be forced to confront unsettled areas of state law — a problem that easily could have been avoided through adherence to traditional abstention principles.

Indeed, taken for what it truly is, plaintiffs' equal protection challenge inevitably requires a detailed probing of South Carolina's enforcement scheme. Thus, it was clearly not an abuse of discretion to abstain from adjudicating this claim. Plaintiffs not only ask a federal court to pass upon the rationality of South Carolina's strategy for

enforcing its gambling laws, but also seek to delve into the strategy's details. Such an undertaking would inevitably require the federal court to interpret and apply the state statute to various individualized decisions made by the state in the enforcement of its gaming laws. For example, to substantiate claims of "discriminatory enforcement," plaintiffs would question which businesses SLED and other law enforcement officers had previously investigated, how those investigations compared with the investigation of gambling enterprises, and whether any differences in enforcement methods were adequately justified. *Cf. Willis v. Town of Marshall*, 426 F.3d 251, 263 (4th Cir. 2005) (vacating summary judgment on plaintiff's claims that she was arbitrarily singled out for punishment under the Equal Protection Clause because the district court denied discovery and plaintiff "had no opportunity to demonstrate that others situated similarly in this regard were not treated similarly").

The majority asserts that discovery burdens imposed upon states in the course of adjudicating such discriminatory enforcement claims are of no moment, asserting that normal discovery burdens cannot justify *Burford* abstention. *See ante* at 11, n.6. To the contrary, these burdens are of moment, and the prospect of them bears legitimately upon the district court's discretion in determining whether to abstain. While discovery burdens do not of course require abstention, a trial judge may forecast that rounds of federal discovery will draw the federal court so deeply into the mechanisms of state administrative operations that avoidance of that friction and interference is a permissible course. This at least is true in areas such as gambling policy, where the states — as a theoretical and an historic matter — may lay claim to sovereign interests.

I do not for a moment fault plaintiffs for their strategy. Rather I commend the district court for recognizing that abstention was the wise and prudent response. It is hard to imagine a greater intrusion into the processes of state government than use of the federal judicial process for a top-to-bottom review of the regulatory and enforcement measures necessary to the implementation of any gambling policy. The trial court below was justified in its conclusion that this assault upon the "rightful independence of state governments in carrying out their domestic policy" would be too much. *See Burford*, 319 U.S. at 318 (internal quotations omitted).

## C.

Plaintiffs finally claim that South Carolina's post-seizure forfeiture scheme violates due process. To say that the district court abused its discretion here is to ignore *Burford*'s counsel that abstention is appropriate when federal review would "disrupt state efforts to establish a coherent policy with respect to a matter of substantial public concern." *NOPSI*, 491 U.S. at 361-63. The district court was entitled to leave undisturbed the considered judgment of the South Carolina Supreme Court that the forfeiture of gaming machines pursuant to §§ 12-21-2710 and 2712 accords with due process requirements. *See 192 Coin-Operated Video Game Machs.*, 525 S.E.2d. at 883.

In *192 Coin-Operated Video Game Machs.*, the South Carolina Supreme Court held that, to comport with the Due Process Clause, § 12-21-2712 must be construed to require that an owner of video gaming machines be given a post-seizure hearing prior to forfeiture of any seized devices alleged to have violated § 12-21-2710. 525 S.E.2d at 883. In so doing, the court overruled *Kizer*, 162 S.E. 444, to the extent it allowed for the destruction of allegedly illegal machines "without any opportunity for the owner to contest the magistrate's determination of illegality." *192 Coin-Operated Video Game Machs.*, 525 S.E.2d at 883. However, the South Carolina Supreme Court rejected the argument that § 12-21-2712 required a pre-seizure hearing, reasoning that "[t]he most due process requires is a post-seizure opportunity for an innocent owner 'to come forward and show, if he can, why the res should not be forfeited and disposed of as provided by law.'" *Id.* (quoting *Moore v. Timmerman*, 276 S.E.2d 290, 293 (S.C. 1981)). The South Carolina Supreme Court has repeatedly affirmed this judgment. *See, e.g.*, *Mims Amusement Co. v. SLED*, 621 S.E.2d 344, 351 (S.C. 2005) ("We conclude an owner's right to due process in the civil forfeiture of a video gaming machine under the state constitution and pertinent statutes is satisfied when he is given a post-seizure hearing before the magistrate, with the right to appeal that ruling to circuit and appellate courts."); *Westside Quik Shop*, 534 S.E.2d at 273 ("We have already determined that the forfeiture of gaming machines pursuant to these statutes accords with due process requirements.").

The district court did not err in according respect to a series of well-considered state decisions in such a core area of state preroga-

tive. Though I reiterate that abstention must be circumscribed, the sky will not fall whenever state courts resolve a federal question. *See U.S. Const. art. VI* ("This Constitution and the laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby. . . ."). They do so routinely, and the Supreme Court has encouraged them to do so in matters central to their sovereignty. In areas of traditional local control, such as land use, the Court has made clear that "[s]tate courts are fully competent to adjudicate constitutional challenges to local . . . decisions. Indeed, state courts undoubtedly have more experience than federal courts do in resolving the complex factual, technical, and legal questions related to [such] regulations." *San Remo Hotel v. City & County of San Francisco*, 545 U.S. 323, 347 (2005). To think that the inferior federal courts must pronounce the final word on every federal question embedded in state law and imbued with attributes of state sovereignty is to subscribe to misguided and ahistorical notions of federal supremacy. The district court was entitled to take into account the fact that "[p]laintiffs' federal claims are secure in state court and are ultimately subject to review." *Martin*, 438 F.Supp.2d at 607.

While "there is, of course, no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of state policy," *Zablocki v. Redhail*, 434 U.S. 374, 380 n.5 (1978), "[t]he adequacy of state court review diminishes plaintiffs' interest in a federal forum," and when — as here — a plaintiff's claims could also be raised in state court, this "militates in favor of abstention," *Collins*, 199 F.3d at 723 (citing *Alabama Pub. Serv. Comm'n v. S. Ry. Co.*, 341 U.S. 341, 349 (1951)). Plaintiffs' true concern is not the security of their constitutional claims in state court, but rather, the unlikelihood that the state courts will be amenable to their endeavor to replace South Carolina's current scheme with a system of their own design.

The South Carolina Supreme Court has rendered measured judgment on this issue; all federal intervention can potentially do at this stage is create a conflict with that judgment and throw South Carolina's efforts to regulate gambling into confusion. Indeed, for reasons discussed throughout, the state's interest in having its rulings preserved is uniquely strong here, as "all branches of South Carolina's government have spent considerable time and energy shaping and

reviewing the statutes being challenged." *Martin*, 438 F.Supp.2d at 607. I do not suggest the district court was obligated to abstain, but neither do I think for a moment that its decision to do so was anything close to an abuse of discretion.

III.

As to the factors the majority accuses me of thinking relevant — "the absence of a federal gambling statute, the effect of the Fourteenth Amendment and 42 U.S.C. § 1983 (2000) on federal-state relations, the history of gambling regulation, the burdens of discovery, and the alleged federalization of gambling policy," *ante* at 15 — I plead totally guilty. I do in fact rely on such things, and I do in fact believe they bear on the soundness of the exercise of federal district court discretion in the area of state gambling policy.

In one respect, I agree with the majority — that abstention must be carefully cabined. Congress controls the jurisdiction of the federal courts, and declining to exercise that jurisdiction is a decision federal judges must take only cautiously and infrequently. The abstention doctrines are not an escape for judges who cannot be bothered with hard questions. Abstention remains the distinct exception, not the general rule.

Having said that, Congress has shown no indication to displace the states' historic role in this area where no federal interest such as Indian tribal lands or United States waters is present. Congress could exercise its enumerated powers at any time to restrain the states' residual powers over gambling operations, but I cannot find that it has manifested any such intent. To reverse the considered judgment of a trial judge in the context of a comprehensive regulatory scheme backed by the core, historic interests of the state goes much too far. It leaves our federal system a subject of lip service and not much more.

The very fact of dual systems of government and dual systems of courts creates some potential for inefficiencies and confusion. Abstention is one of those sparingly utilized means necessary to smooth the roughest edges and produce a more harmonious system. The majority does more, however, than exacerbate tensions. It autho-

rizes lawsuits that will begin slowly to federalize — in all its aspects — questions of state gambling policy. It will do what Congress has declined to do. The majority deprives the state of a significant measure of control over issues touching not simply the pros and cons of gambling but the very tone and quality of life within state borders. This is not federalism. I respectfully dissent.