*371 WILKINSON, Circuit Judge,
dissenting:
There are few decisions more central to state authority than whether to allow legalized gambling, how extensively, and under what terms. Plaintiffs’ lawsuit calls for both the interpretation of state law at the heart of the state’s regulatory scheme and an extensive inquiry into the state’s enforcement practices. While plaintiffs may certainly challenge South Carolina’s exercise of its police powers as unconstitutional, the district court was within its authority to conclude that plaintiffs’ constitutional challenge would be most properly heard in state court.
Congress has given no indication that it wishes to sweep most federal challenges to state gambling policy into federal court. I do not believe that the general grant of federal concurrent jurisdiction in 42 U.S.C. § 1983 manifests any congressional intention to abrogate the discretion of federal district courts to defer under Burford to the complex state administrative and judicial mechanisms involved in regulating gambling enterprises.
And it is not only congressional intent that I believe has been offended. In holding that the district court abused its discretion by abstaining, the majority diminishes the capacity of trial courts to perform the judicious balancing that lies at the heart of any exercise of equitable discretion. The majority also disrespects the role of state courts: while we properly defer to federal administrative agencies under Chevron Step Two, somehow the federal courts are now to be prohibited from showing even a lessened deference to state administrative and judicial systems operating in their own areas of expertise. Further, because federal courts will make an understandable effort to avoid inconsistency and interference with the states, the majority approach will also in time shortchange litigants. Finally, the majority diminishes the values of our federal system, which can hardly be served in this most traditional area of state competence by having the federal appellate courts call the shots. I am at a loss to understand what aims of law are furthered when the federal circuit courts undercut the legitimate institutional interests of so many other actors within our legal system.
This dispute is not confined simply to the case at hand. It touches on the basic application of abstention principles to state regulatory regimes in the most sensitive areas of state sovereignty — an issue that has been rife with conflicting approaches. “[Ljower courts continue to disagree as to when [Burford] abstention is appropriate.” Erwin Chemerinsky, Federal Jurisdiction § 12.2, at 784-85 & nn. 108-09 (4th ed.2004). “Confusion over the scope of Burford abounds.... ” Gordon G. Young, Federal Court Abstention and State Administrative Law from Burford to Anken-brandt, 42 DePaul L.Rev. 859, 866 (1993).
In the gambling context, specifically, similar confusion reigns, with some courts refusing to abstain, and others deciding abstention is appropriate when a federal court is confronted with challenges to state gambling laws. Compare Hotel & Rest. Employees & Bartenders Int’l Union Local 54 v. Danziger, 709 F.2d 815 (3d Cir.1983), judgment vacated on other grounds by Brown v. Hotel & Rest. Employees & Bartenders Int’l Union Local 54, 468 U.S. 491, 104 S.Ct. 3179, 82 L.Ed.2d 373 (1984)(refusing to apply Burford abstention to challenges to portions of state gambling scheme); Turf Paradise, Inc. v. Ariz. Downs, 670 F.2d 813 (9th Cir.1982)(same) with Johnson v. Collins Entm’t Co., 199 F.3d 710 (4th Cir.1999)(abstaining under Burford from deciding challenges to state gambling regime); G2, Inc. v. Midwest *372 Gaming, Inc., 485 F.Supp.2d 757 (W.D.Tex.2007) (same); Metro Riverboat Assocs., Inc. v. Bally’s Louisiana, Inc., 142 F.Supp.2d 765 (E.D.La.2001)(same); Diamond Game Enter. v. Howland, 1999 WL 397743 (D.Or.1999)(same). While factual differences no doubt exist between these cases, there is a basic divide between those who believe Burford abstention has some modest utility in the face of constitutional challenges to state regulatory regimes and those who do not.[1]
I see no indication in this case that the South Carolina state courts have defaulted in any fashion on their obligation to entertain federal constitutional challenges to the operation of state gambling laws. I see no way in this case to avoid the interpretation of difficult questions of state law and interference with state regulatory policies. I see no sign in this case that interpretation of the terms of any federal statute involving gambling is at issue or that Congress has done anything to remove the choice among different approaches to gambling regulation from its historic venue in the states.
Given the absence of any specific manifestation of congressional jurisdictional intent in the area of gambling, I remain unconvinced that the general expression of federal jurisdictional authority pursuant to § 1983 is enough to divest district courts of their discretion to accord respect to state regulatory choices regarding gaming policy and state court review of those choices. While I recognize that the Fourteenth Amendment and § 1983 re-ordered federal and state relationships (including the relationships between federal and state courts) in the most fundamental way, I do not think it re-ordered these relationships to such an extent as to render Burford abstention virtually inapplicable to all constitutional challenges in federal court to specialized state regulatory regimes. I see nothing to justify the majority’s holding that no reasonable district court could, in these circumstances, stay its hand.
I.
Federal courts have reason to tread cautiously in addressing a state’s regulation of gambling, because such schemes of regulation lie at “the heart of the state’s police power.” Collins, 199 F.3d at 720. In fact, few activities have been so consistently treated as being at the core of state sovereignty. Id. South Carolina, in particular, has long exercised its police power in this area, developing over time a complex and comprehensive system to regulate gambling activity.
A.
The Supreme Court has treated the regulation of gambling as a quintessential state function for more than a century. See United States v. Edge Broad. Co., 509 U.S. 418, 426, 113 S.Ct. 2696, 125 L.Ed.2d 345 (1993); Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico, 478 U.S. 328, 341, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986); Marvin v. Trout, 199 U.S. 212, 224, 26 S.Ct. 31, 50 L.Ed. 157 (1905). Our circuit has recognized police power author *373 ity in this area time and again. See, e.g., Helton v. Hunt, 330 F.3d 242, 246 (4th Cir.2003); Casino Ventures v. Stewart, 183 F.3d 307, 310 (4th Cir.1999). The authority of the states as to gambling is a matter of broad consensus among our sister circuits. See Gulfstream Park Racing Ass’n v. Tampa Bay Downs, Inc., 399 F.3d 1276, 1278 (11th Cir.2005) (“The regulation of gambling lies at ‘the heart of the state’s police power.’ ”) (quoting Collins, 199 F.3d at 720); United States v. Washington, 879 F.2d 1400, 1401 (6th Cir.1989) (“The enactment of gambling laws is clearly a proper exercise of the state’s police power in an effort to promote the public welfare.”); Medina v. Rudman, 545 F.2d 244, 251 (1st Cir.1976) (same); Boynton v. Ellis, 57 F.2d 665, 666 (10th Cir.1932) (same).
State control over gambling has also been reinforced by Congress. While federal interests may sometimes be affected by gambling — as, for instance, when casinos are established on Indian reservations or in United States waters — Congress has generally “sought to extend, not curb, state police power in this field.” Casino Ventures, 183 F.3d at 311.
In exercising their police power, states may reasonably conclude that gambling brings an “increase in local crime, the fostering of prostitution, the development of corruption, and the infiltration of organized crime.” Posadas, 478 U.S. at 341, 106 S.Ct. 2968. They may also conclude that gambling fosters addiction and exploits human weakness, drawing down the assets of those who can least afford to gamble money away. See Collins, 199 F.3d at 720; Posadas, 478 U.S. at 341, 106 S.Ct. 2968.
At the same time, states often invoke the police power to control gambling rather than prohibit it. States may well conclude that permitting gambling enhances public welfare by allowing citizens free choice in their recreational pursuits and by spurring economic growth through gambling-related business enterprises. In addition, gambling can generate tax revenue that may fund schools, public works, and other government programs. See Collins, 199 F.3d at 720. States may also conclude that legalized gambling is a lesser evil, believing the activity’s harms can best be harnessed when the activity is subject to regulation and kept in plain view.
The diversity of views towards gambling has given rise to schemes of regulation that are nearly as varied as the states establishing them. Several states — Utah and Hawaii, for example — forbid commercial gambling altogether. See Utah Const. Art. VI, § 27; Hawaii Rev. Stat. § 712-1223 (2006). Many others — more than two-thirds, as of 1999 — allow government-controlled gambling in the form of lotteries. National Gambling Impact Study Commission Final Report (“NGISC Report”) (1999), available at http://govinfo. library.unt.edu/ngisc/reports/fullrpt.html, Page 2-1 (last visited July 19, 2007). Some states, such as Nevada, New Jersey, and Mississippi, have gone further, permitting privately run gambling within their borders. And there are variations even among these. Nevada, for instance, allows slot machines virtually anywhere, including at airports and supermarkets. On the other hand, Mississippi and New Jersey concentrate legalized gambling in limited areas, the former restricting gambling to coastal counties and riverboats, and the latter restricting gambling to Atlantic City alone. NGISC Report 2-4; 2-7; 3-5. Regardless of the particular scheme, states that allow legalized gambling impose a unique mix of controls on gambling venues, including licensing requirements, number, size, and type of site standards, and advertising limitations.
*374 I would be hard-pressed to identify any field of regulation about which there is broader or deeper consensus on the appropriateness of state control.
B.
For decades, the South Carolina General Assembly has sought to balance “the revenue gained from licensing and taxation of [gambling] against the social costs of gambling addiction.” Collins, 199 F.3d at 716. In doing so, the General Assembly has tried a number of plans to determine the appropriate level of gambling control, and has developed numerous mechanisms to enforce its regulations. The South Carolina General Assembly initially banned all gambling, with the exception of “coin operated nonpayout machines with a free play feature” as long as the machines did not disburse “money or property” to a player. S.C.Code Ann. § 16-19-60 (Law.Coop.1976) (amended to delete the word “property,” see Act effective June 18, 1986, Part II, § 26(B), S.C. Acts 540). The state later experimented with legalized electronic gambling from 1982 to 2000, exempting “video games with a free play feature” from prohibition. 1982 S.C. Act No. 466.[2] And in State v. Blackmon, 304 S.C. 270, 403 S.E.2d 660, 661-62 (1991), the South Carolina Supreme Court held that nonma-chine cash payouts from these video gaming machines were legal under S.C.Code Ann. § 16-19-60 (Supp.1999).[3]
Such machines are now once again forbidden by South Carolina law. It is presently “unlawful for any person to keep on his premises or operate or permit to be kept on his premises or operated within this State” certain gambling devices. The devices prohibited include “any vending or slot machine, or any video game machine with a free play feature operated by a slot in which is deposited a coin or thing of value, or other device operated by a slot in which is deposited a coin or thing of value for the play of poker, blackjack, keno, lotto, bingo, or craps” as well as “any punch board, pull board, or other device pertaining to games of chance of whatever name or kind.... ” S.C.Code Ann. § 12-21-2710 (2006).
South Carolina has long employed a multitiered regulatory structure — comprised of legislative, executive, administrative, and judicial mechanisms — to enforce its gambling laws. Currently, no fewer than five different state entities are part of this effort. First, State Law Enforcement Division (SLED) officers have the authority to enforce South Carolina’s gaming statutes. See S.C.Code Ann. § 23-3-15 (2006). According to plaintiffs, at least one SLED officer has received specialized training on whether a particular video game machine qualifies as a “game of chance.”
Second, the South Carolina Attorney General issues opinion letters that construe the statutory scheme and provide guidance to SLED officers. See, e.g., Letter from Attorney General Charles M. Condon to South Carolina Law Enforcement Division Chief Robert M. Stewart (May 8, 2000), available at www.sctax.org/ Publications/vg''opn5800.pdf (last visited July 19, 2007).
Third, after SLED officers seize machines they consider to be in violation of *375 state law, the devices are brought before state magistrates. These magistrates, who have expertise in the particulars of South Carolina’s gaming laws, “immediately examine” each machine and make a determination of their legality as the machines are configured at that time. See S.C.Code Ann. § 12-21-2712 (2006); Allendale County Sheriff’s Office v. Two Chess Challenge II, 361 S.C. 581, 606 S.E.2d 471 (2004). These magistrates provide specialized review of the machines, determining whether they constitute an illegal “game of chance” under § 12-21-2710, the very provision a federal court would need to interpret to evaluate plaintiffs’ claims. Further, the magistrates serve to place “some restraint” upon law enforcement officers “who represent the executive authority of the state....” State v. Kizer, 164 S.C. 383, 162 S.E. 444, 449 (1932), overruled on other grounds by State v. 192 Coin-Operated Video Game Machs., 338 S.C. 176, 525 S.E.2d 872 (2000).
Fourth, a machine owner may appeal a magistrate’s decision through the state court system, which has heard scores of cases defining the contours of the state’s gambling laws. See, e.g., 192 Coin-Operated Video Game Machs., 338 S.C. 176, 525 S.E.2d 872; Westside Quik Shop Inc. v. Stewart, 341 S.C. 297, 534 S.E.2d 270 (2000), overruled in part by Byrd v. City of Hartsville, 365 S.C. 650, 620 S.E.2d 76 (2005); Joytime Distribs. & Amusement Co. v. South Carolina, 338 S.C. 634, 528 S.E.2d 647 (1999); Johnson v. Collins Entm’t Co., 333 S.C. 96, 508 S.E.2d 575 (1998); Martin v. Condon, 324 S.C. 183, 478 S.E.2d 272 (1996); Blackmon, 304 S.C. 270, 403 S.E.2d 660.
Fifth, the South Carolina Department of Revenue issues biannual licenses to owners of video game machines that remain legal. See S.C.Code Ann. § 12-21-2720 (2006) (allowing video machines, with a license, for the playing of music, kiddy rides, “machines for the playing of amusements or video games, without a free play feature, or machines of the crane type operated by a slot ... and a machine for the playing of games or amusements, which has a free play feature, operated by a slot ... and the machine is of the nonpayout pin table type with levers or ‘flippers’ operated by the player in which the course of the balls may be altered or changed.... ”). In sum, South Carolina has established a specialized scheme to interpret and enforce laws that lie at the center of state sovereignty.
II.
As the district court recognized, abstention was warranted here because plaintiffs’ lawsuit threatens to trammel South Carolina’s highly reticulated regulatory regime. Plaintiffs raise three claims. First, they assert that § 12-21-2710’s prohibition against possessing any “device pertaining to games of chance of whatever name or kind” is void for vagueness. Second, plaintiffs challenge South Carolina’s gambling scheme on equal protection grounds, asserting that they are “being subjected to discriminatory enforcement of the laws pertaining to video game machines.... ” Brief of Appellants at 5. Finally, plaintiffs challenge the post-seizure procedure by which South Carolina determines the legality or illegality of a particular video gaming device. The district court was entitled to abstain from deciding these claims, for reasons I shall discuss in turn.
A.
Plaintiffs first claim that the provision forbidding “devices pertaining to games of chance of whatever name or kind” is void for vagueness on the theory that “its prohibitions are not clearly defined.” Grayned v. City of Rockford, 408 U.S. *376 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Specifically, plaintiffs contend that this provision could be read to outlaw Monopoly, simple card games, and personal computer and cell phone games such as minesweeper and solitaire. See Brief of Appellants at 5. While I emphatically do not embrace the proposition that every vagueness challenge to a state statute in federal court warrants abstention, neither do I subscribe to the view that every unclear question of state law forecloses abstention in favor of a federal vagueness challenge. Contrary to the majority’s contention that plaintiffs’ challenge “involves no difficult question of state law,” ante at 366, plaintiffs’ claim that “games of chance” is “not clearly defined” is certainly plausible enough that the district court’s decision to abstain cannot be considered an abuse of discretion. Indeed, federal court involvement here will interfere with the detailed, individualized analysis required to determine what constitutes a “game of chance” and will inescapably intrude upon South Carolina’s regulatory system.
In this case, in order to evaluate plaintiffs’ vagueness challenge, the federal court would have to define “games of chance,” a task it cannot complete without delving into the “meaning, interpretations, and the general regulatory context” of § 12-21-2710. Martin v. Stewart, 438 F.Supp.2d 603, 607 (D.S.C.2006). The meaning and precise application in any given case of “games of chance” lie at the core of South Carolina’s regulation of gaming; interpreting this provision would therefore enmesh the federal court in a question of state law that bears not simply on a “policy problem[ ] of substantial public import,” New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans (“NOPSI”), 491 U.S. 350, 361, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989), but arguably on “the most hotly contested issue in South Carolina in recent years.” Collins, 199 F.3d at 715.
The majority’s conclusion that no “difficult question of state law” is presented here is astounding, insofar as its basis is the South Carolina Supreme Court’s 1971 holding that “a man of reasonable intelligence is given fair notice of the machines proscribed” by the provision. Ante at 367 (citing State v. DeAngelis, 257 S.C. 44, 183 S.E.2d 906, 908 (1971)). While the majority says that the statutory text is “clear and certain” because it is given its “ordinary meaning,” ante at 366, that circular formulation begs the question of what its ordinary meaning even is. Further, such highly generalized formulations of the provision’s meaning elide every difficult question the state courts must face when interpreting and applying § 12-21-2710. Far from being “clear and certain,” the provision outlawing “games of chance” is one that South Carolina state courts must apply, on a machine-by-machine basis, to a complex and ever-changing cadre of gambling technology. Indeed, the development of video gaming machine technology and of the state courts’ application of § 12-21-2710 to that technology demonstrate that the meaning and treatment of “games of chance” present “difficult questions of state law” from which the district court legitimately abstained.
For starters, not even primitive versions of the video gaming machines involved in this case were in existence at the time of DeAngelis. Such machines did not become commercially viable until the mid- to late-1970s, when it first became economical to combine a television-like monitor with a central processing unit. In fact, it was not until Si Redd’s Coin Machines (SIRCOMA) introduced Draw Poker in 1979 that such devices gained any measure of popularity. See Ireck Galecki, “Video Poker History,” Dec. 6, 2006, available at *377 http://onlinecasinopress.co.uk/video-poker-history.html (last visited July 19, 2007); see also “History of Video Slot Machines,” available at http://www.videoslotmachines. com/history.htm (last visited July 19, 2007); “History of Video Poker,” available at http://www.videopoker247.com/history. html (last visited July 19, 2007). Although the language “games of chance” can be found in the gaming statute as of 1971, S.C.Code Ann. § 5-621 (Code 1962), and the current statute, S.C.Code Ann. § 12-21-2710, the former was not part of a larger statutory provision that includes reference to any type of video gaming device. And although the majority is correct that “slot machines have changed since the 1960s, [while] the substance of [section 12-21-2710] has not,” the difficult task of distinguishing lawful from unlawful games has been complicated dramatically by these technological developments. Ante at 366, n. 4 (citing 192 Coin-Operated Video Game Machs., 525 S.E.2d at 878-79). In fact, technological developments in the thirty-six years since DeAngelis bear very directly on the line of demarcation between prohibited “games of chance” and permitted “games of skill.” Indeed, what may have been clear to a “man of reasonable intelligence” regarding this distinction in 1971 can simply no longer be so. The legality of a particular machine must be determined on an individual basis at the time of seizure, because “video machines may be manipulated so as to change their nature from lawful to unlawful.... ” Allen-dale County Sheriff’s Office, 606 S.E.2d at 474.
Not surprisingly, evaluations of these machines are quite detailed. For example, after a thorough examination of two Chess Challenge II game machines, the magistrate judge in Allendale County found the games lawful, relying in part on a detailed affidavit which explained, “the Chess Challenge II game operates in a different manner from the illegal games of chance.... Chess Challenge II operates utilizing a repeating pattern and does not utilize features that would prevent a player’s skill from determining the outcome of the game. In addition, a player is able to identify the icons as they appear, and to time the stopping of the game to increase the chance of winning.” Id. at 472, n. 1.
And in Sun Light Prepaid Phonecard Co., Inc. v. State, 360 S.C. 49, 600 S.E.2d 61, 64 (2004), the South Carolina Supreme Court held that machines dispensing prepaid, long distance telephone cards with attached game pieces constituted illegal gambling devices, because a detailed evaluation revealed that the machines (1) housed a video screen with a gambling theme; (2) played celebration music after dispensing a winning game piece; (3) froze if a pre-determined level of prize money was attained; (4) contained two meters: one which recorded the amount of money entering the machine and one (labeled “WON”) which “record[ed] the value of the prizes issued by the machines”; (5) lacked a mechanism for returning change; and (6) could be linked with other machines. Id. at 63.
My friends in the majority, however, refuse to allow the state courts to undertake the delicate task of distinguishing between lawful and unlawful games. Because South Carolina’s gaming statutes justifiably call for a machine-by-machine determination of legality, the majority’s notion that it somehow can interpret “games of chance” in bulk, without disrupting South Carolina’s enforcement scheme, rides roughshod over the scheme itself and the principles of federalism it purports to observe.
It is thus no simple task for the South Carolina courts to interpret and apply § 12-21-2710, which is entrenched in a *378 highly reticulated regulatory scheme, to a range of ever-changing, technologically advanced devices. The majority’s insistence that the district court abused its discretion in abstaining, however, will complicate state tasks immeasurably. It threatens to “disrupt the State’s attempt to ensure uniformity in the treatment of an ‘essentially local problem.’ ” NOPSI, 491 U.S. at 362, 109 S.Ct. 2506. Burford abstention exists to “protect[ ] complex state administrative processes from undue federal interference.” Indeed, a case like this one, in which the federal court is called upon to resolve a “difficult question[ ] of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar,” provides a paradigmatic example of the circumstances justifying Burford abstention. NOPSI, 491 U.S. at 361, 109 S.Ct. 2506 (quoting Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 814, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)). To say the district court abused its discretion in abstaining is beyond erroneous.
B.
Plaintiffs also mount an equal protection challenge to South Carolina’s gaming laws. Plaintiffs argue that because video gaming machine owners are unable to obtain pre-enforcement review of the legality of their business pursuits like other entrepreneurs can, South Carolina makes use of “an arbitrary, capricious classification that is not rationally related to the purposes of the statute.” Complaint at 10, par. 38. Further, plaintiffs contend that they are “being subjected to discriminatory enforcement of the laws pertaining to video game machines ... in an effort to restrict Plaintiffs’ meaningful participation in the political process in South Carolina.” Id., par. 39.
The majority asserts that plaintiffs merely “launch a facial attack on the state statutes as a whole,” thus presenting a case federal courts “often and expertly entertain.” Ante at 366-68. Such antiseptic treatment of plaintiffs’ claim, however, exalts form over substance and gives short shrift to the essence of plaintiffs’ challenge — namely that the statute is being enforced against them in a discriminatory manner. See Complaint at 10, par. 39. Simply describing a challenge as facial does not necessarily make it so. Instead, courts must look to the underlying import of the claim, not just to incantation of magic words and labels. Here, plaintiffs clearly desire to sift through South Carolina’s entire gambling enforcement scheme, to probe all its intricate details in the name of discovery. See Brief of Appellants' at 8-9. Rather than recognizing the claim for what it actually is, the majority accepts what it misguidedly purports to be.
By turning a blind eye to this claim’s true character, the majority’s approach threatens one of two possible consequences, neither of which is appealing. First, if the district court treats this as a true facial challenge, rather than what plaintiffs desire it to be — an as — applied challenge in the guise of a facial attack— plaintiffs’ claim will have been unfairly decapitated. Under a facial challenge, plaintiffs can only attack the statutory provision in the abstract, not ascertain whether it could be enforced, discriminatorily or otherwise, against particular machines — their true concern. This result leaves plaintiffs in the unenviable position of wanting to be in federal court one day, but not the next. At the same time, the majority sends the troubling message to district courts that they can skirt potential abstention problems by characterizing claims such as this as mere facial challenges. Thus, in an effort to avoid interference with state law, *379 federal courts may construe complaints to present less serious challenges than they in fact do.
The second potential consequence stems from the majority’s failure to anticipate how plaintiffs intend for this litigation to unfold. Despite the “facial” label applied to their discriminatory enforcement claim, plaintiffs’ requested discovery here would put South Carolina’s regulatory regime through the wringer. And as the suit moves forward, the district court will assuredly be forced to confront unsettled areas of state law — a problem that easily could have been avoided through adherence to traditional abstention principles.
Indeed, taken for what it truly is, plaintiffs’ equal protection challenge inevitably requires a detailed probing of South Carolina’s enforcement scheme. Thus, it was clearly not an abuse of discretion to abstain from adjudicating this claim. Plaintiffs not only ask a federal court to pass upon the rationality of South Carolina’s strategy for enforcing its gambling laws, but also seek to delve into the strategy’s details. Such an undertaking would inevitably require the federal court to interpret and apply the state statute to various individualized decisions made by the state in the enforcement of its gaming laws. For example, to substantiate claims of “discriminatory enforcement,” plaintiffs would question which businesses SLED and other law enforcement officers had previously investigated, how those investigations compared with the investigation of gambling enterprises, and whether any differences in enforcement methods were adequately justified. Cf. Willis v. Town of Marshall, 426 F.3d 251, 263 (4th Cir.2005) (vacating summary judgment on plaintiffs claims that she was arbitrarily singled out for punishment under the Equal Protection Clause because the district court denied discovery and plaintiff “had no opportunity to demonstrate that others situated similarly in this regard were not treated similarly”).
The majority asserts that discovery burdens imposed upon states in the course of adjudicating such discriminatory enforcement claims are of no moment, asserting that normal discovery burdens cannot justify Bwrford abstention. See ante at 367, n. 6. To the contrary, these burdens are of moment, and the prospect of them bears legitimately upon the district court’s discretion in determining whether to abstain. While discovery burdens do not of course require abstention, a trial judge may forecast that rounds of federal discovery will draw the federal court so deeply into the mechanisms of state administrative operations that avoidance of that friction and interference is a permissible course. This at least is true in areas such as gambling policy, where the states — as a theoretical and an historic matter — may lay claim to sovereign interests.
I do not for a moment fault plaintiffs for their strategy. Rather I commend the district court for recognizing that abstention was the wise and prudent response. It is hard to imagine a greater intrusion into the processes of state government than use of the federal judicial process for a top-to-bottom review of the regulatory and enforcement measures necessary to the implementation of any gambling policy. The trial court below was justified in its conclusion that this assault upon the “rightful independence of state governments in carrying out their domestic policy” would be too much. See Burford, 319 U.S. at 318, 63 S.Ct. 1098 (internal quotations omitted).
C.
Plaintiffs finally claim that South Carolina’s post-seizure forfeiture scheme violates due process. To say that the district *380 court abused its discretion here is to ignore Burford’s counsel that abstention is appropriate when federal review would “disrupt state efforts to establish a coherent policy with respect to a matter of substantial public concern.” NOPSI, 491 U.S. at 361-63, 109 S.Ct. 2506. The district court was entitled to leave undisturbed the considered judgment of the South Carolina Supreme Court that the forfeiture of gaming machines pursuant to §§ 12-21-2710 and 2712 accords with due process requirements. See 192 Coin-Operated Video Game Machs., 525 S.E.2d. at 883.
In 192 Coin-Operated Video Game Machs., the South Carolina Supreme Court held that, to comport with the Due Process Clause, § 12-21-2712 must be construed to require that an owner of video gaming machines be given a post-seizure hearing prior to forfeiture of any seized devices alleged to have violated § 12-21-2710. 525 S.E.2d at 883. In so doing, the court overruled Kizer, 164 S.C. 383, 162 S.E. 444, to the extent it allowed for the destruction of allegedly illegal machines “without any opportunity for the owner to contest the magistrate’s determination of illegality.” 192 Coin-Operated Video Game Machs., 525 S.E.2d at 883. However, the South Carolina Supreme Court rejected the argument that § 12-21-2712 required a pre-seizure hearing, reasoning that “[t]he most due process requires is a post-seizure opportunity for an innocent owner ‘to come forward and show, if he can, why the res should not be forfeited and disposed of as provided by law.’ ” Id. (quoting Moore v. Timmerman, 276 S.C. 104, 276 S.E.2d 290, 293 (1981)). The South Carolina Supreme Court has repeatedly affirmed this judgment. See, e.g., Mims Amusement Co. v. SLED, 366 S.C. 141, 621 S.E.2d 344, 351 (S.C.2005) (“We conclude an owner’s right to due process in the civil forfeiture of a video gaming machine under the state constitution and pertinent statutes is satisfied when he is given a post-seizure hearing before the magistrate, with the right to appeal that ruling to circuit and appellate courts.”); Westside Quik Shop, 534 S.E.2d at 273 (“We have already determined that the forfeiture of gaming machines pursuant to these statutes accords with due process requirements.”).
The district court did not err in according respect to a series of well-considered state decisions in such a core area of state prerogative. Though I reiterate that abstention must be circumscribed, the sky will not fall whenever state courts resolve a federal question. See U.S. Const, art. VI (“This Constitution and the laws of the United States ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby....”). They do so routinely, and the Supreme Court has encouraged them to do so in matters central to their sovereignty. In areas of traditional local control, such as land use, the Court has made clear that “[s]tate courts are fully competent to adjudicate constitutional challenges to local ... decisions. Indeed, state courts undoubtedly have more experience than federal courts do in resolving the complex factual, technical, and legal questions related to [such] regulations.” San Remo Hotel v. City & County of San Francisco, 545 U.S. 323, 347, 125 S.Ct. 2491, 162 L.Ed.2d 315 (2005). To think that the inferior federal courts must pronounce the final word on every federal question embedded in state law and imbued with attributes of state sovereignty is to subscribe to misguided and ahistorical notions of federal supremacy. The district court was entitled to take into account the fact that “[pjlaintiffs’ federal claims are secure in state court and are ultimately subject to review.” Martin, 438 F.Supp.2d at 607.
*381 While “there is, of course, no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of state policy,” Zablocki v. Redhail, 434 U.S. 374, 380 n. 5, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978), “[t]he adequacy of state court review diminishes plaintiffs’ interest in a federal forum,” and when — as here — a plaintiffs claims could also be raised in state court, this “militates in favor of abstention,” Collins, 199 F.3d at 723 (citing Alabama Pub. Serv. Comm’n v. S. Ry. Co., 341 U.S. 341, 349, 71 S.Ct. 762, 95 L.Ed. 1002 (1951)). Plaintiffs’ true concern is not the security of their constitutional claims in state court, but rather, the unlikelihood that the state courts will be amenable to their endeavor to replace South Carolina’s current scheme with a system of their own design.
The South Carolina Supreme Court has rendered measured judgment on this issue; all federal intervention can potentially do at this stage is create a conflict with that judgment and throw South Carolina’s efforts to regulate gambling into confusion. Indeed, for reasons discussed throughout, the state’s interest in having its rulings preserved is uniquely strong here, as “all branches of South Carolina’s government have spent considerable time and energy shaping and reviewing the statutes being challenged.” Martin, 438 F.Supp.2d at 607. I do not suggest the district court was obligated to abstain, but neither do I think for a moment that its decision to do so was anything close to an abuse of discretion.
III.
As to the factors the majority accuses me of thinking relevant — “the absence of a federal gambling statute, the effect of the Fourteenth Amendment and 42 U.S.C. § 1983 (2000) on federal-state relations, the history of gambling regulation, the burdens of discovery, and the alleged federalization of gambling policy,” ante at 370 — I plead totally guilty. I do in fact rely on such things, and I do in fact believe they bear on the soundness of the exercise of federal district court discretion in the area of state gambling policy.
In one respect, I agree with the majority — that abstention must be carefully cab-ined. Congress controls the jurisdiction of the federal courts, and declining to exercise that jurisdiction is a decision federal judges must take only cautiously and infrequently. The abstention doctrines are not an escape for judges who cannot be bothered with hard questions. Abstention remains the distinct exception, not the general rule.
Having said that, Congress has shown no indication to displace the states’ historic role in this area where no federal interest such as Indian tribal lands or United States waters is present. Congress could exercise its enumerated powers at any time to restrain the states’ residual powers over gambling operations, but I cannot find that it has manifested any such intent. To reverse the considered judgment of a trial judge in the context of a comprehensive regulatory scheme backed by the core, historic interests of the state goes much too far. It leaves our federal system a subject of lip service and not much more.
The very fact of dual systems of government and dual systems of courts creates some potential for inefficiencies and confusion. Abstention is one of those sparingly utilized means necessary to smooth the roughest edges and produce a more harmonious system. The majority does more, however, than exacerbate tensions. It authorizes lawsuits that will begin slowly to federalize — in all its aspects — questions of state gambling policy. It will do what Congress has declined to do. The majority deprives the state of a significant meas *382 ure of control over issues touching not simply the pros and cons of gambling but the very tone and quality of life within state borders. This is not federalism. I respectfully dissent.

. Lower courts have also abstained from deciding cases involving state gambling schemes under other abstention doctrines. See Taylor v. Siegelman, 230 F.Supp.2d 1284 (N.D.Ala.2002)(abstaining from plaintiffs’ challenge to state gambling statute under Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746 (1971)); Club Ass’n of W.Va., Inc. v. Wise, 156 F.Supp.2d 599 (S.D.W.Va.2001) (abstaining from a challenge to state gambling statutes under R.R. Comm’n of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941)); Chun v. State of New York, 807 F.Supp. 288 (S.D.N.Y.1992)(abstaining from a challenge to state gambling scheme under both Pullman and Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943)).

. Codified as S.C.Code Ann. § 52-15-10 and subsequently recodified as § 12-21-2710. In 1997, this section was amended to limit the exemption to those video games "which meet the technical requirements provided for in Section 12-21-2782 and Section 12 — 21— 2783.” 1997 S.C. Act No. 155, Pt. II, § 54(B).

. Repealed effective July 1, 2000, by 1999 S.C. Act No. 125, Pt. I, § 8.